THE UNITED STATES, PLAINTIFFS IN ERROR, *v.* THE BANK
OF THE METROPOLIS, DEFENDANT IN ERROR.

The United States instituted a suit against the Bank of the Metropolis, claiming
twenty-seven thousand eight hundred and eighty-one dollars and fifty-seven cents,
the balance, according to the statements of the Treasury, due to the United States.
The defendant claimed credits amounting to twenty-three thousand dollars, exclu-
sive of interest, which had been presented to the proper accounting officers, for accept-
ances of the Post Office Department of the drafts of mail contractors, and an item of
six hundred and eleven dollars and fifty-two cents, overdraft of an officer of the
Post Office Department, on the Bank of the Metropolis. The drafts of the con-
tractors, accepted by the Post Office Department, were discounted by the Bank, in
the way of business; one draft was accepted unconditionally; the other drafts were
accepted, "on condition, that the contracts be complied with." Held: That the
Bank became the holder of the draft unconditionally accepted, for valuable con-
sideration; and its right to charge the United States with the amount cannot be
defeated by any equities between the drawers, and the Post Office.

When the United States, by its authorized officer, become a party to negotiable
paper, they have all the rights, and incur all the responsibilities of individuals who
are parties to such instruments. There is no difference, except that the United
States cannot be sued. But if the United States sue, and the defendant holds its
negotiable paper, the amount of it may be claimed as a credit, if, after being pre-
sented it has been disallowed by the accounting officers of the Treasury; and if the
liability of the United States on it be not discharged by some of those causes which
discharge a party to commercial paper, it should be allowed by a jury as a credit
against a debt claimed by the United States. This is the privilege of the defend-
ant for all equivalent credits, under the act of March 3d, 1797. The case of The
United States *v.* Dunn, 6 Peters, 51, cited.

From the daily, and almost unavoidable use of commercial paper by the United States,
they are as much interested as the community at large can be, in maintaining the
principles of commercial law involved in this case.

It was no matter, how the account of the drawer of the draft unconditionally accepted,
stood with the Post Office Department; whether he was a debtor or a creditor; whether
the Bank knew one or the other. An unconditional acceptance was tendered to the
Bank for discount. It was not the duty of the Bank to inquire how the account stood,
or for what purpose the acceptance was made. All it had to look to was the
genuineness of the acceptance, and the authority of the officer to give it.

The rule is, that the want of consideration between the drawer and the acceptor is no
defence against the rights of a third party, who has given a consideration for the
bill; and this, even though the acceptor has been defrauded by the drawee, if that
be not known to such third party.

If one purpose making a conditional acceptance only, and commit that acceptance to
writing, he should be careful to express the condition therein. He cannot use gene-

[The United States *v.* Bank of the Metropolis.]

ral terms, and then exempt himself from liability, by relying upon particular facts which have already happened, though they are connected with the conditional acceptance. By express terms the acceptor might have guarded against any construction, other than that which was intended by, or was the apparent meaning of the words of the acceptance. It matters not what the acceptor meant by a cautious and precise phraseology, if it be not expressed as a condition.

Nothing out of the condition expressed in the words of the acceptance can be inferred; unless it be in a case where the words used are so ambiguous as to make it necessary that parol evidence should be resorted to, to explain them.

It must be conceded, as a general principle, that one having knowledge of particular facts upon which he intends to rely to exempt him from a pecuniary obligation about to be contracted with another, of which facts the other is ignorant, and can only learn from him, or from documents in his keeping, that the fact of his knowledge raises the obligation to tell it.

If two persons deal in relation to the executory contracts of a third, and one of them, being the obligee, induces the other to advance money, "upon condition that his contracts be complied with;" and he knows that forfeitures have been already incurred by the obligor, for breaches of his contract, and does not say so; he shall not be permitted afterwards to get rid of his liability, by saying "I cannot pay you, for when I accepted there was already due to me from the drawer of the bill more than I accepted for ; you did not chose to make inquiry."

The terms "accepted, when the contracts of the drawer of the bill are complied with," are not retroactive; they do not refer to past transactions, but to the subsequent performance of the contractors.

The Postmaster General had the same power, and no more, over the credits allowed by his predecessor, if allowed within the scope of his official authority, as given by law to the head of the Department. This right in an incumbent of reviewing a predecessor's decisions, extends to mistakes in matters of fact, arising from errors in calculation, and to cases of rejected claims, in which material testimony is afterwards discovered and produced. But, if a credit has been given, or an allowance made by the head of a Department, and it is alleged to be an illegal allowance, the judicial tribunals must be resorted to, to construe the law under which the allowance was made; and to settle the right between the United States, and the party to whom the credit was given. It is no longer a case between one officer's judgment, and that of his successor. No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute, and it may be done by the direction of the incumbent of the Department.

It is certainly the Treasury of the United States where its money is directed by law to be kept: but if those whose duty it is to disburse appropriations made by law, employ, or are permitted by law to employ, either for safe keeping or more convenient disbursement, other agencies, and it shall be necessary for the United States to sue for the recovery of the fund, the defendant may claim against the demand for which the action has been brought any credits to which he shall prove himself entitled; if they have been previously presented to the proper accounting officers of the Treasury Department, and have been rejected. This right was early given to defendants in all suits brought by the United States.

When any instructions to the jury are asked of the Court, on the trial of a cause, they should be precise and certain to a particular intent, that the point intended to be

raised, may be distinctly seen by the Court; and that error, if one be made, may be distinctly assigned.

IN error to the Circuit Court of the United States, for the county of Washington, in the District of Columbia.

The United States on the 25th of June, 1838, instituted an action of assumpsit against the President and Directors of the Bank of the Metropolis, for the recovery of twenty-seven thousand eight hundred and eighty-one dollars and fifty cents, for sundry matters properly chargeable in an account, as by an account annexed to the declaration appeared. The declaration contained the usual counts in an action of assumpsit.

The account referred to contained numerous items of deposits made in the Bank of the Metropolis, from the Post Office Department, leaving a balance due the United States of the sum stated in the declaration.

The defendants pleaded the general issue.

The defence to the claim of the United States, was founded on credits which amounted to twenty-three thousand dollars, exclusive of interest, which had been presented to the accounting officers of the Treasury, and which had been refused allowance. They were for acceptances of the Post Office Department of drafts drawn upon the Post Office Department, and an overdraft by E. F. Brown, an agent of the Post Office Department.

The jury found a verdict for the defendant, and certified that there was due from the United States to the bank three thousand three hundred and seventy-one dollars and ninety-four cents, with interest, from March 6, 1838.

The plaintiffs, on the trial, asked the Court to give certain instructions to the jury, which was refused, to which the plaintiffs excepted. These are stated in the opinion of the Court.

The United States prosecuted this writ of error to the judgment of the Circuit Court, entered on the verdict. The case is fully stated in the arguments of the Counsel and in the opinion of the Court.

The case was argued by Mr. Gilpin, Attorney General, for the United States; and by Mr. Coxe, for the defendant.

Mr. Gilpin, the Attorney General, for the United States.

In the year 1836, the Bank of the Metropolis was a depositary

of public moneys, which were in the Treasury of the United States. On the 2d July, an act of Congress (4 Story's Laws, 2464) was passed, ordering that all the public revenue derived from postages should be deposited, when collected, "in the Treasury of the United States," as the rest of the revenue was; and that it should be there held by the Treasurer to pay such appropriations as might be directed by Congress for "the service of the Post Office Department." On the 16th July deposits were made, under this act, in the Bank of the Metropolis; and, when they were so made, written instructions were given by the Postmaster General, and acceded to by the Bank, that the post office revenue, as deposited, was to be kept in the name of the "Treasurer of the United States for the service of the Post Office Department;" to be paid on his warrants, to be reported monthly, and settled quarterly, with him; and that "there was to be no credit, deduction, or set-off admitted, except for moneys drawn out on the Treasurer's warrant." At the monthly return of 1st October, 1837, there was a balance of revenue deposited to the credit of the Treasurer of the United States of forty-two thousand one hundred and seventy-one dollars and eighty-eight cents. During that month the deposit was increased by the sum of one thousand three hundred and seventeen dollars and fifty-seven cents, and warrants of the Treasurer, amounting to sixteen thousand one hundred and thirty-two dollars and eighty-eight cents, were paid; thus leaving a balance to the credit of the Treasurer of twenty-seven thousand three hundred and fifty-six dollars and fifty-seven cents. Instead of reporting this balance on the 1st November, 1837, the Bank admitted a balance, only, of one thousand and thirty-one dollars and ninety-seven cents, having deducted therefrom the amount, with interest, of a draft fo· ten thousand dollars, drawn on the 14th April, 1835, at ninety days, by Edwin Porter on Richard C. Mason, "Treasurer of the Post Office Department," and accepted by him as "Treasurer;" and, also, of four draughts for thirteen thousand dollars, drawn in October, 1835, at ninety days, by James Reeside on Amos Kendall, Postmaster General, and accepted by him "on condition that his contract be complied with." All these drafts had been discounted by the Bank before they became due; but had not been paid by the acceptors. The Bank, also, deducted six

hundred and eleven dollars and fifty-two cents, which sum was overdrawn in the year 1835 by E. F. Brown, the agent for disbursing the contingent fund of the Post Office Department. These credits were claimed at the Treasury and disallowed.

At June term, 1838, a suit was brought by the United States to recover the whole balance of twenty-seven thousand three hundred and fifty-six dollars and fifty-seven cents. On the trial, the Bank proved the facts above stated, and claimed the credits which had been disallowed. The District Attorney of the United States requested the Court to charge the jury on three points; which were, substantially, as follows:

1. That if they believed there was nothing due to Porter and Reeside, at the time of the acceptance of their drafts, or at the time they became due, the Bank was not authorized by law to set off such draught against the deposit of "the Treasurer of the United States."

2. That if the accounts of Porter and Reeside were not finally settled at the Department, it was the duty of the Postmaster General to have them settled; and, in such settlement, he ought not to allow credits for illegal extra allowances, where such allowances had been merely entered in the journal, but never brought into the ledger.

3. That the overdraft of the agent for disbursing the contingent fund could not, by law, be set off against the deposit of "the Treasurer of the United States."

These instructions the Court refused to give; and it is submitted that they erred in so doing.

I. When Porter's draft became due, was it a just claim against the United States; would the acceptor have been justified, by law, in paying it to the drawer? He accepted the draught as a public officer—as "Treasurer of the Post Office Department." He was to pay it out of the public money in his hands, appropriated by law to pay the drawer when it became due. It was an arrangement between the Department and a contractor, for the benefit of the latter. It was an acknowledgment in advance. When the day of payment arrived, the money had not been earned; no debt was due from the United States to Porter; there is, consequently, no appropriation by law to pay him. If paid, he receives, from the public treasury, money not

appropriated to him. Could the acceptance of a public officer, made under a misapprehension of the facts, authorize this? If it be a principle not doubted, that the neglect of a public officer cannot deprive the United States of their right to recover money from their debtors; is it not a principle equally well founded that they cannot be made to pay money twice by his error or indiscretion? Can the Treasurer of the Post Office Department, or any other officer, promise to pay a sum of public money ninety days hence, and then draw it from the public treasury, whether justly due or not? Under the instruction, as asked, the question whether the money was owing or not to Porter on the day when the draft became due, does not arise; for it was requested in the event of the jury believing that nothing was owing; but the evidence shows that when that day arrived, every thing to which he was entitled had already been absorbed by forfeitures and drafts previously drawn and accepted. A payment made to him, then, would not have been made because he was entitled to the money, but only because the Treasurer of the Post Office Department had accepted his draft. The Constitution, art. i. sec. 9, par. 6, forbids the payment of any money from the Treasury, but in pursuance of appropriations made by law. The appropriation for the benefit of Porter was exhausted. He had received from it all that he was entitled to. To pay him more would be to pay that for which there was no appropriation. The United States *v.* Barney, 3 Law Jour. 130. The United States *v.* Nicoll, 1 Paine, 649.

If, then, it be established that the United States would not have been bound to pay Porter himself, notwithstanding his possession of the acceptance, were they bound to pay the Bank to whom he transferred it? An illegal payment is not authorized, by the Constitution or law, to be made to a transferree, any more than to the claimant himself. Every principle which forbids double payment to one, forbids it to the two. It is not requisite to controvert the general rule of commercial law, discussed before this Court in the case of Townly *v.* Sumrall, 2 Peters, 183. 185, as to the liability of an acceptor, whether he has funds or not, for an unconditional acceptance; nor is it necessary to examine how far the ordinary responsibility, which attaches to parties to negotiable paper, can be imppsed, by the

acts of their officers, on the United States; or how far such rules can be applied to them, in a case where they have the effect to draw money from the Treasury, without an appropriation; (12 Wheat. 561. 4 Wash. C. C. R. 464;) because, in this instance, the acceptance was clearly of such a nature as to put the acceptor on his guard.  If it was not strictly conditional, in terms, it was so in substance.  The Bank knew, when it received the draught, that it was payable out of a public fund; and that the payment could not be made, unless there was money, appropriated by law for that purpose, in the hands of the acceptor. They knew the acceptance was given by the acceptor " as Treasurer;" and that the law of the land gave public notice that the Treasurer could not bind the United States, beyond the funds appropriated for the use of the drawer.  Suppose an agent accepts as agent, will it be pretended that the principal is bound beyond the extent of his agency?  The holder must inquire into that extent; must see the acceptor's authority; must know how far the acceptance binds the principal.  1 Peters, 283. 290. There is no hardship or injustice in this; the Bank, like any other holder, had ample opportunity, before it discounted the draft, to ascertain the exact extent of the obligation assumed by the acceptor.  This principle, which is just in every case, is peculiarly proper in that of the United States.  How can they guard themselves against acts of their agents, either intentionally or accidentally wrong, except by their laws?  These are notice to every person dealing with their officers.  These make their acceptances, special acceptances, whether so declared in terms or not.  Not only, however, did the Bank know the special and conditional character of the acceptance; but they knew also that it was payable on a contingency, and out of a particular fund; that if that fund was previously exhausted, the acceptor could not pay it.  On settled principles of commercial law, therefore, the Bank was not entitled to payment, any more than the drawer himself; if the fund was exhausted.  If they advanced their money imprudently, it was yet done advisedly: they could have easily guarded against the loss: they can now only repair it, so far as the United States are concerned, through the action of the legislature.

II. These principles apply more strongly to the acceptances

of Reeside's drafts, because they were conditional in express terms. They were only to be paid " on condition that his contracts were complied with." The Bank need not have discounted a conditional acceptance, but having done so, it assumes the burden of showing that the condition has been performed, before it can charge the acceptor. 4 Maul. and Selw. 466. 2 Wash. C. C. R. 514. Has it done so? The only evidence adduced by them is, that Reeside performed, in the year 1835, the mail services for which he contracted. That a "compliance" with all the terms of his contracts has been shown, will scarcely be pretended. If it were, evidence, adduced by the Bank itself, sufficiently refutes it. It is proved that stipulations were expressly made by him, not only to perform mail services, but to "pay all forfeitures," and to "repay all advances." Was his contract complied with, if forfeitures were unpaid, and advances not refunded? Had such a contract existed between man and man, and such an acceptance been given and received, could the holder, in the face of such proof, recover from the acceptor? How, then, can it be sufficient, when that acceptor is a public officer, to make him twice pay the money from the public Treasury?

III. As if aware of the force of these objections, it has been strenuously argued that there were, in fact, moneys due, which were sufficient to pay all these acceptances. If this were so, it is immaterial as to the error in the charge of the Court, because, in the instruction prayed, that was left as a matter of fact for the jury. But how is it attempted to be shown that it was so? It is not by proving that the forfeitures were not incurred, or that the advances were returned; but it is said that allowances, sufficient to cover them, were made by the former Postmaster General. It is true that such allowances are found to be entered in the journal; but they were never finally credited in the settlement of the accounts. It may be admitted, as has been argued, that when the head of an executive department has finally acted upon a matter within the scope of his authority, his decision cannot be reversed by his successor, to the disadvantage of a third person, without the disclosure of material error, otherwise than by resorting to judicial proceedings. But such is not the case here. These were merely journal memorandums, such as must necessarily be made in the course of proceedings between

a mail contractor and the Post Office Department; they were left to be finally settled when the account was adjusted. Would it be contended, if the contractor had, in his own journal, charged himself with a payment he had not received, or a forfeiture he not incurred, that the error could not be corrected in the final settlement? In the case of Ex parte Randolph, 9 Peters, 15, which is relied on, the account had been entirely settled; it had passed through all the forms of the Treasury; it reposed in the Register's office as a final and conclusive adjustment. The ground taken, therefore, does not sustain the assertion that the money was due; and the Court below should have instructed the jury to that effect. They should have instructed them, that the mere fact of there having been allowances made in the journal, and while the account was unsettled, which allowances are alleged to be illegal and contrary to the contract, and were rescinded as such before the account was closed, cannot of itself authorize the admission of a credit for their amount.

But, it is said, that even if these forfeitures and advances might be lawfully recharged; yet that the condition of the acceptances had no reference to them; that it was not retrospective, but had relation merely to the performance of future duties under the contract. Such a distinction, between the several duties to be performed under the contract, is not warranted by the language of the condition, which is general. The condition was inserted for the safety of the acceptor; the acceptance was for the benefit of the contractor; in conferring that benefit, the protection of the acceptor was to be provided for; the Bank knew this to be the case; the advance of money by it was a voluntary act for its own advantage, and in making it, there was no pretext for overlooking the safety of the acceptor; this depended no less on the repayment of past advances, than on the performance of future services. Why should the acceptor, in seeking to protect himself, guard less against one than the other? The condition referred to the contract, the whole contract; that condition was submitted to the Bank before its money was advanced; the whole contract, therefore, was, or might and ought to have been known; and it would be a great injustice to the acceptor, when he states his condition in terms so broad as clearly to secure for himself the performance of every stipulation

of the contract, were the party that obtains his guarantee for the payment, to be permitted to diminish that security in regard to some of the most essential of those stipulations. It is not possible, in an acceptance, to state all the particulars of a contract; it is sufficient to embrace it entirely, by general and comprehensive words, not susceptible of being misunderstood. When this is done, no one has a right to allege ignorance of any part of that which he might easily have known. How could the acceptor apprize every one, into whose hands the draft might pass, of every stipulation of the contract? It was sufficient that he apprized him, before he incurred any responsibility, that a contract existed between the drawer and the acceptor, which might be ascertained, and must be performed in all its parts, before the latter either intended or engaged to be responsible.

IV. The claim to be repaid the overdraft of E. F. Brown, cannot be sustained. He deposited in the Bank, on the 30th of April, 1835, the sum of seven thousand and seventy dollars, and twenty-four cents. He drew checks on this till the 2d December, 1835, when he had received thereon, seven thousand six hundred and seventy-one dollars, and seventy-six cents; that is, six hundred and eleven dollars, and twenty-four cents more than he had deposited. There is no proof, nor even an allegation, that this latter sum was applied to the use of the United States. The sole grounds of claim are, that, from June, 1835, the checks of Brown were countersigned by the Accountant of the Department; and that, after the contingent fund was exhausted, and previous to the passage of the annual appropriation act, some ordinary bills, certified by the Accountant, were paid by the Bank. In what manner do these acts recognise the overdraft? In itself it was wrong. It was a transaction known only to the Bank and Brown. It might have been prevented by the former. It is excused by no proof that such agents as he was, were usually, or ever permitted to make overdrafts. The countersignature by the Accountant, and the payment of bills, at the express request of the Postmaster General, are proofs that any deviation from the usual mode was only to be made by express authority. None such is exhibited for this overdraft. It was, therefore, an act voluntarily done by the Bank, not for the benefit of the United States, and with which it has no right to charge them.

V. But suppose all these sums are legal credits, can they be set off or deducted from moneys deposited in the bank, after the 2d of July, 1836, to the credit of "the Treasurer of the United States, for the service of the Post Office Department?" That was public money in the treasury. It could be drawn out in no way but by a warrant, under an appropriation made by act of Congress. It was not under the control of the Postmaster General. It was not money which he had received in order to disburse; nor was it under the control of the Treasurer himself, except to pay it on such a warrant. He could have no other voucher to discharge himself, if the money was not in the Treasury. 1 Story's Laws, 46. These provisions of law were known to the Bank when it received the deposit from the Treasurer. They cannot charge against it a claim which, if the Treasurer himself had paid, he would not be credited with.

The debts do not arise in the same right, nor are they of the same nature. It is true that the United States are, eventually, the parties; but the public funds, distributed for different objects, are separate funds in the transactions between a claimant and the various officers of the government. Such a distinction is indispensable. The relations between a bank and the Treasurer as a public depositary, are totally distinct from those between a bank and the head of an executive department, in relation to contracts existing between them. The settlement of its account with one, would have no reference to that with the other. They are, therefore, in fact, debts that do not arise between the same parties, or in the same right. In every case of set-off recognised by this Court, it has been for moneys properly payable out of the same fund which the United States sought to recover.

An agent intrusted with money cannot pay off his principal's debts, and then set off the payment. This is here attempted, for it is the payment of a debt to Porter and Reeside, with funds with which the agent is intrusted for a different purpose. 1 Rawle, 330. Nor can an agent convert to one purpose, funds deposited with him for another. Nor can he avail himself of the advantages of his agency, to do, for his own benefit, that which injures or affects his principal. 1 Johns. C. C. 394.   6 Pick. 204.

The inability, thus established, to sustain, upon general principles of law, such a right of set-off as is now contended for is con-

firmed by the peculiar facts of this case. The whole claim of the Bank was ascertained and liquidated in January, 1836. This deduction is made out of money placed in its hands subsequent to that time, under a promise, both express and implied, that it would not be appropriated to the payment of that claim. Before so depositing the money, the Postmaster General, in his letter of 16th July, 1836, stipulated that it should "be paid out only on the checks of the Treasurer," and that, in accounting for the sums thus deposited, "no other credit, set-off, or deduction would be admitted." On this condition, and on this alone, did the Bank receive the money; and that at a time when both parties knew that there was this actual pending claim to a credit, set-off, and deduction, existing and disputed between them. Even if the Bank had not agreed to this express stipulation when it received the money, would not their consent to transfer the fund they then had to a new account, their silent acquiescence, their settlement of repeated monthly and quarterly accounts, without an allusion to a claim of right to make this deduction, have proved, by an implication, not to be resisted, that they did not mean to assert any such right? Did not their special acceptance of the fund, their voluntary agreement to hold it for a special purpose, deprive them of any general claim they might previously have had upon it? 16 Vesey, 279, 280. 5 Mau. & Selw. 186. 15 Mass. 397.

However broad the terms of the act of Congress (1 Story's Laws, 464) are, therefore, in allowing equitable offsets; and if they were not meant to be exclusively applicable to disbursing officers, and to cases where the claim, if just, would have been paid out of the fund in controversy; (9 Cranch, 236. 6 Wheat. 163. 7 Peters, 1;) still, the positive agreement of the party, after the claim has arisen, and before the money was paid, put into his hands, that the latter was not to be applied to the former, must on every principle of law prevent his present resort to a privilege which he thus consented to forego.

Mr. Coxe, for the defendant in error.

For many years the government of the United States have made use of the banks in the city of Washington in their financial operations; and the Bank of the Metropolis was for a long time one of these banks. In 1835, Mr. Kendall became

[The United States *v.* Bank of the Metropolis.]

Postmaster General; and up to the period of his entering on the duties of his office, there were no matters with the Bank unsettled in the Post Office.

The Post Office was in the practice of giving acceptances on drafts of contractors; and, sometimes, the Bank of the Metropolis was resorted to for the immediate exigencies of the Post, Office.

The position assumed is, that the instructions asked for by the plaintiffs in the Circuit Court were not such as the Court should have given, being informal, and rather a demurrer to the evidence on the part of the defendant. The party asking the instructions of the Court is bound to place them in proper form; and the Court are not to modify and adapt them to the case. In this case all the grounds of the defence were placed together, and if any of the items were good as set off to the claim of the United States, the instructions asked for were improper; and the Court will give the defendant judgment. The other instructions are equally defective.

The credits allowed by the Postmaster General, before the office was held by Mr. Kendall, were final. When entered in the journal, this was the effect of such entry; and the head of the Department cannot afterwards alter them. Entries in the ledger have no effect on those credits. One of the instructions asked for by the plaintiff was, that, as the entries in the ledger were made by a clerk, they were of no effect!

If allowances had been made by the Postmaster General, which were deemed illegal by his successor, the proper course would have been to institute an action to surcharge and falsify the settlement. But it is not in the power of the successor to open the account, and to revise and alter it. This was decided this Court in The United States *v.* Fillebrown, 7 Peters, 1; id in 8 Peters, 383, 384.

The act of Congress of March, 1836, which directs the Postmaster General to institute suits for money improperly credited, does not allow that officer to charge a contractor with money which had been allowed and credited to him, and thus by his own act decide the propriety of the charge.

The acceptances of the Post Office Department, which were charged by the defendants to the United States, should be governed by the same rules and principles of law which operate in

2 K 2

relation to such contracts, in their usual employment in commercial transactions. The United States submit themselves to these rules, when such contracts are entered into for them, by their authorized agents.

Mr. Coxe also contended, that if the contracts of the persons whose drafts had been accepted by the Post Office Department had not been performed, it was the duty of the Department to have given the defendants notice of the same, and to have proved the non-performance. As to the acceptance of the draft of Edwin Porter, certainly no debts due by him before the date of the acceptance could be set off against the claim of the Bank on the acceptance. It was a general and an unqualified acceptance.

Mr. Justice WAYNE delivered the opinion of the Court.

This is an action of assumpsit brought by the United States to recover the sum of twenty-seven thousand eight hundred and eighty-one dollars and fifty-seven cents. The defendants pleaded the general issue. On the trial of the cause, the defendants claimed credits, amounting to twenty-three thousand dollars, exclusive of interests and costs. The items had been presented to the proper accounting officer and were not allowed. They were acceptances of the Post Office Department, of the drafts of mail contractors, and an item of six hundred and eleven dollars and fifty-two cents, called in the record " E. F. Brown's overdraft."

The jury found for the defendants, and certified there was due to them by the United States three thousand three hundred and seventy-one dollars and ninety-four cents, with interest from the 6th March, 1838.

The errors assigned are, that the Court refused to give to the jury the following instructions, which were asked after the evidence had been closed on both sides.

1. That upon the evidence aforesaid, the defendants are not entitled in this action to set off against the plaintiff's demand, the amount of the acceptances given in evidence by the defendants, nor the amount of the overdraft of E. F. Brown.

2. If the jury believe, from the evidence, that when the acceptance of the draft of E. Porter was given by the then Treasurer

of the Department, there was nothing due to Porter standing on the books of the Post Office Department, and that on the books of the Department, when the acceptance fell due there was nothing due to him; then the defendants cannot set off the amount of said acceptance against the plaintiff's claim in this action.

3. That if the accounts of E. Porter and Reeside, as contractors with the Post Office Department, were not finally settled on the books of the Post Office Department when the present Postmaster General came into office, it was his duty to have said accounts settled; and if in such settlement there were credits claimed by them as allowed by order of Mr. Barry, when Postmaster General, and entered on the journal, but not carried into these accounts in the ledger, and finally entered as credits in these accounts, which credits were for extra allowances which the said Postmaster General was not legally authorized to allow them, then it was in the power and was the duty of the present Postmaster General, to disallow such items of credit.

We will consider the instructions asked, in connexion, and upon the merits of the case; but before we conclude will express an opinion upon the form of the first.

It appears, that the five drafts claimed as credits were drawn on the Post Office Department by contractors for carrying the mails. That they were accepted, and were discounted at the Metropolis Bank in the way of business.

Porter's draft was at ninety days after date, for ten thousand dollars, payable at the Metropolis Bank to his own order, to be charged to account; and was unconditionally accepted by R. C. Mason, signing himself Treasurer of the Post Office Department. It is admitted that he was so.

Reeside drew four drafts. One on the 17th October, 1835, for four thousand five hundred dollars; another on the 20th October, 1835, for one thousand dollars; a third on the 23d October, 1835, for four thousand five hundred dollars; and the fourth on the 28th October, 1835, for three thousand dollars. They were payable to his own order ninety days after date, for value received; to be charged to his account for transporting the mail, and addressed to the Postmaster General. The following was the form of all of them, and of the acceptances of the Postmaster General.

$4500.          *Washington City, October 17th, 1835.*

SIR:—Ninety days after date, please pay to my own order, four thousand five hundred dollars, for value received, and charge to my account, for transporting the mail.

Respectfully yours,      JAMES REESIDE.

Hon. AMOS. KENDALL, Postmaster General.

" Accepted on condition that his contracts be complied with."

AMOS KENDALL.

Porter's draft was unconditionally accepted. It was discounted by the defendants, upon his endorsement. The Bank became the holder of it, for valuable consideration, and its right to charge the United States with the amount cannot be defeated by any equities between the drawer and the Post Office Department, of which the Bank had not notice.

When the United States, by its authorized officer, become a party to negotiable paper, they have all the rights, and incur all the responsibility of individuals who are parties to such instruments. We know of no difference, except that the United States cannot be sued. But if the United States sue, and a defendant holds its negotiable paper, the amount of it may be claimed as a credit, if, after being presented, it has been disallowed by the accounting officers of the Treasury ; and if the liability of the United States upon it, be not discharged by some of those causes which discharge a party to commercial paper, it should be allowed by a jury, as a credit against the debt claimed by the United States. This is the privilege of a defendant, for all equitable credits given by the act of March 3d, 1797. 1 Story, 464. This, and the liability of the United States, in the manner it has been stated, has been repeatedly declared, in effect, by this Court. It said, in the case of the United States v. Dunn, 6 Peters, 51, " the liability of parties to a bill of exchange, or promissory note, has been fixed on certain principles, which are essential to the credit and circulation of such paper. These principles originated in the convenience of commercial transactions, and cannot now be departed from." From the daily and unavoidable use of commercial paper by the United States, they are as much interested as the community at large can be, in maintaining these principles.

It was held, in the case of The United States v. Barker, 4 Wash. C. C. R. 464, that the omission of the Secretary of the Treasury, for one day, to give notice of the dishonour of bills, which were purchased by the United States, discharged the drawer. And this Court said, when that case was brought before it, there was no right to recover; on account of the neglect in giving notice after the return of the bills. 12 Wheaton, 561. That, and other cases like it, show how rigidly those principles have been applied in suits on bills and promissory notes, in which the United States was a party. The acceptance of Porter's draft was unconditional, and there is nothing in the evidence to discharge the acceptor. There is neither waiver, express or implied, of his liability. There was no understanding nor communication concerning it between the Bank and any officer of the Post Office Department, before it was discounted. The Bank advanced the money, which it was the object of the bill to obtain. It cannot be doubted, the acceptance was given for that purpose. The want of consideration then, between the drawer and the acceptor, can be no defence against the right of the indorsee, who gave a valuable consideration for the bill.

It does not matter how the drawer's account stood. Whether he was a debtor or a creditor of the Department; whether the Bank knew one or the other. An unconditional acceptance was tendered to it for discount. It was not its duty to inquire how the account stood, or for what purpose the acceptance was made. All it had to look to was the genuineness of the acceptance, and the authority of the officer to give it. The rule is, that a want of consideration between the drawer and acceptor is no defence against the right of a third party, who has given a consideration for the bill, and this even though the acceptor has been defrauded by the drawer; if that be not known by such third party, before he gives value for it.

The evidence then, concerning Porter's account, was immaterial and irrelevant to the issue. It cannot affect the rights of the Bank, and did not lessen the obligation of the Department to pay the acceptance when it became due.

But the evidence does not show that any thing was due by Porter when the draft was accepted, or when it came to maturity. Mason, the witness, says, " that in the interim a sufficient

sum had been raised and carried to the credit of Porter, to pay the draft; but that he had also, within the dates, been charged with the amount of a draft, drawn upon him by the Postmaster at Mobile, accepted by him, which draft was payable in 1833, and that he was charged with failures and forfeitures incurred as contractor, in 1833; which charges were made by order of Mr. Barry, then Postmaster General. It was certainly right to debit Porter with these charges, if they were due by him; but that did not change the relative rights and obligations of the Bank and the Department upon his bill. If either are to lose by Porter, shall it be that party, who was bound to know the state of the account, before it gave an unconditional acceptance, for the purpose of accommodating its own agent; or the other, who placed faith in the acceptance, advanced the money upon it, which it was intended to raise; and who could not have learned what was the state of Porter's account, as it is proved that the charges which it is now said should have priority of payment over the bill were not made against Porter until after his bill had been accepted. Certainly, the loss should fall upon the first. It cannot be otherwise, unless it would be affirmed that an acceptor may claim to be discharged on account of his own negligence, and that having induced a third party to advance money upon his acceptance, he shall be permitted to intervene between himself and the endorsee of the paper, a debt due to him by the drawer. The evidence offered to invalidate this credit was done from ignorance of the legal consequences incurred by such an acceptance. In such a case, the bank rightfully looked to the United States for payment of this bill; and if Porter owes any thing for forfeitures incurred as contractor, or on account of the Mobile draft, the United States must look to him. There is no proof on the record, however, of any thing being due by Porter on those accounts; and we do not intend to express any opinion upon his liability, or the rights of the United States, in respect to them, one way or the other.

What are the merits of the case upon Reeside's drafts.

They were drawn on the Postmaster General, at ninety days, payable to the order of the drawer, and were to be charged to his account for transporting the mail. They were "accepted on condition that his contracts be complied with." This is of course

as binding as an absolute acceptance, if the condition has been performed.

What is the proof of performance, and how shall this conditional acceptance be construed? Mason, the witness, says, "Reeside, in fact, performed the services for which he was contractor, in the year 1835; and the money which he earned upon his contracts was applied, to an extent exceeding the amount due upon his drafts, to the extinguishment of balances created against him, by recharging him with sums of money which had been allowed to him by Mr. Barry, the former Postmaster General, as contractor for carrying the mail, by giving him credit therefor in a general account current on the journal, but not entered in the ledger, where his account remained unsettled when the present Postmaster General came into office." It is said, this does not cover the condition of the acceptance, because Reeside stipulated, by his bond, to pay forfeitures, and repay advances; and that he owed the Department on both accounts, when these acceptances were given; and that in this sense his contracts were not complied with. If this be so, in one sense the contracts would not be complied with: but is that the construction which should be put upon such a condition, when the subject matter to which it relates is considered?

If one purpose making a conditional acceptance, only, and commit that acceptance to writing, he should be careful to express the condition therein. He cannot use general terms, and then exempt himself from liability, by relying upon particular facts which have already happened, though they are connected with the condition expressed. Why? Because the particular fact is of itself susceptible of being made a distinct condition. This case furnishes as good an illustration of the rule as any other can do. Instead of the words being used, "accepted on condition that his contracts be complied with," could it not have been as easily said, accepted on condition that forfeitures already incurred shall be paid, and that advances made shall be refunded. This would have conveyed a very different meaning; and would have put the Bank, when the drafts were offered to it for discount, on inquiry. If they had been discounted without inquiry, it would have been done at the risk that the earnings upon the contracts, and such as might be earned between the date of

the acceptances and the times of payment, would be enough to pay forfeitures, repay advances, and to take up the bills. It matters not what the acceptor meant by a cautious and precise phraseology, if it be not expressed as a condition. And when we are told, as we are in this case, by the person making these acceptances, that the form of words was devised expressly for that purpose, meaning for the purposes of having forfeitures paid and advances refunded, and to avoid promising to pay any thing to the order of contractors so long as any thing should be due from them to the Department; we think it will be admitted that the purpose explained is larger than the condition expressed. And from the passage in the evidence just cited, how just does the rule appear which has been laid down by the Court, that, in the case of acceptances of commercial paper, that which can be made a distinct condition must be so expressed; nor can any thing out of the condition be inferred, unless it be in a case where the words used are so ambiguous as to make it necessary that parol evidence should be resorted to, to explain them. Then the onus of proof would be on the acceptor, and the proof would be of no avail if the holder or any person under whom he claims, took the bill without notice of such conditions and gave a valuable consideration for it. The error in this case arose from the acceptor supposing that the defendants did know, and if they did not, they were bound upon such an acceptance to inquire into the stipulations and conditions of Reeside's contracts before they discounted the bills; and it is said they did not use " due diligence to acquire information." The objection then implies that information of these forfeitures and advances could have been given, and that it was not given when these acceptances were made. This makes it, then, a question of due diligence between the acceptor and the defendants, as to his obligation to communicate what he knew; and their want of caution in not making the inquiry.

We think it will be conceded to be a general principle, that one having knowledge of particular facts upon which he intends to rely to exempt him from a pecuniary obligation, about to be contracted with another—of which facts that other is ignorant, and can only learn them from the first, or from documents in his keeping—that the fact of knowledge raises the obligation upon

[The United States *v.* Bank of the Metropolis.]

him to tell it. This would be the law in such a case, and it is in this case. Inquiry by the defendants would, at most, have resulted in obtaining what was already known to the acceptor. He held the contracts : he knew, or should have known, officially the state of the accounts between the contractor and the Department, and when he conditionally accepted his drafts, which were to be charged to his account for transporting the mail; as his liability to pay them would occur in ninety days, it was but reasonable that he should have said in plain terms, when giving his acceptances, "If the earnings of the contractor from this time to the maturity of the draft, shall be sufficient to pay what he owes, and the debt he may incur until then, then these drafts will be paid." This would have been a condition about which there would have been no mistake.

But, further, if two persons deal in relation to the executory contracts of a third; as these contracts were; and one of them being the obligee induces the other to advance money to the obligor, upon "condition that his contracts be complied with;" and he knows that forfeitures have been already incurred by the obligor, for breaches of his contract, and does not say so; shall he be permitted afterwards to get rid of his liability, by saying to the person making the advance, "I cannot pay you, for when I accepted there was already due to me from the drawer of the bill more than I accepted for. I had knowledge of it then, and so might you have had if you had made the inquiry; but you did not choose to inquire; so I will pay myself first, because my acceptance was on condition that his contracts be complied with?"

Such is the case before us as it was presented by the argument; and we cannot doubt it will be thought decisive that it was the duty of the acceptor, in this instance, to communicate what he knew of Reeside's account, if he had any conversation with the defendants before the drafts were discounted, and that it was not the duty of the defendants to inquire. It cannot be answered by saying the words of the acceptance were intended to provide for what might exist; but what was not then known, or for breaches of the contracts which had already occurred, but which had not been charged with a penalty; for either would be an admission that inquiry by the defendants when the accept-

ances were made, could not have resulted in getting the informa-tion at the Department.

But, again, will the terms of the acceptance admit in any way of retroactive construction? The words must be taken according to the ordinary import of them. They are "accepted on condition that his contracts be complied with." Can there be compliance with an executory contract, but in future, if breaches have already happened. Supposing no breaches to have occurred, necessarily implies such as may occur in future, and subsequent compliance. If both past and future breaches, then, are, as contended for, to be comprehended within the condition of this acceptance, why may not the condition be extended to such as may happen after the maturity of the drafts, as well as to such as had occurred before they were accepted? A literal interpretation must lead to both, and that will not be contended for. But the argument is, that the defendants should have inquired into the "stipulations of the contracts and the extent of the condition;" and it is said, "the Bank would have been informed, that the Department expected Mr. Reeside to renew his drafts until the accumulation of his current pay would be sufficient to meet them; and had his pledge to take them up himself, if earlier payment should be required." Be it so. Can there be a plainer admission than there is in the preceding sentence, written by the acceptor, that it is necessary to go out of the condition of the acceptance to ascertain his meaning, and that his construction rests upon facts, known by himself and Mr. Reeside, which the defendants could not have known but from one or the other of them? facts out of the condition, and which could alone become a condition by being so expressed. Again, it is taken for granted in the argument, if the defendants had inquired into the stipulations of the contracts and the bond, that they would have been informed of the forfeitures which had been incurred. But that would not follow. Before such knowledge could have been obtained, it would have been necessary to take one step further beyond the condition—an inquiry into the accounts. Where shall such construction stop, if it be allowed at all. The law does not permit a conditional acceptance to be construed by any thing extraneous to it, unless where the terms used are so ambiguous that it cannot be otherwise ascertained.

We will suppose, however, that the stipulations of Reeside's contract, and his bond, had been known to the defendants. Might they not very justifiably have concluded, that his drafts were accepted to aid him with an advance to fulfil his engagements? The bond in evidence, shows that a necessity for advances was contemplated. It had been the habit of the Department to make them to contractors. Its exigencies, it is said, required advances to be made. The witness, Mason, says, "From the year 1830, the pecuniary affairs of the Department were much deranged, and it was frequently unable to pay debts due by it to contractors. Under such circumstances, the Department was in the practice of giving to contractors acceptances for sums less than was actually standing to their credit, unconditionally; and such acceptances were always taken up at maturity, prior to May, 1835. That occasionally, and with the special approbation of the Postmaster General, acceptances were given upon the faith of existing contracts, conditional upon the performance of the contracts, which were understood to become absolute, if the contractor performed the services stated in the contract." The defendants, in the year 1835, held acceptances of the same character, for more than seventy thousand dollars, all of which were under protest for non-payment, but subsequently paid prior to the institution of this suit, except those in dispute in this case. The witness further says, the Bank of the Metropolis, and other banks in the city of Washington and elsewhere, have been, for many years, in the practice of discounting such acceptances. That it was often done for the accommodation of the Department, often for the accommodation of the drawer, and frequently of both. This testimony brings the Department and the Bank in connexion upon acceptances of the former for contractors; shows the course of business upon them; and aids to give a proper construction to the acceptances under consideration. When it is remembered, also, that these acceptances were given to renew others of the Department, which were overdue, we think it cannot be doubted, that the terms, "accepted on condition that his contracts be complied with," cannot retroact to embrace forfeitures which had been incurred, and to refund advances said to have been made before the date of these acceptances. The argument upon this point was made upon the false assumption

that there had been a communication between the Postmaster General and the defendants concerning these acceptances, before they were discounted; or that there was an obligation upon the part of the defendants to make an inquiry into the state of Reeside's contracts, and his fulfilment of them, because the acceptances were conditional. It did not exist here, nor does it in any case of a conditional acceptance. The acceptor is bound by his contract as it is expressed, and so it may be negotiated, without any further inquiry.

Having fully canvassed the argument upon the point of the obligation of the defendants to inquire into the condition of the acceptance; we turn, for a moment, to the case as it is shown to be by the evidence.

Reeside's earnings between the date of the acceptances and the time for the payment of them, were not applied to pay forfeitures, or refund advances. They were exhausted by recharging him with sums of money, which Mr. Barry had allowed to him as contractor for carrying the mail, which were credited in the journal, but not entered into the ledger. That they were not posted, cannot affect Reeside's right to such allowances; and something more must appear than the testimony in this case discloses, before it can be admitted, that credits given by Mr. Barry were legally withdrawn by his successor. There is no evidence in this cause to impeach the fairness and legality of the allowances credited by Mr. Barry; no proof that Reeside had incurred forfeitures, or that advances had been made to him. Proofs should have been given, if it was intended to justify the recharges for the causes stated. No attempt was made to do so. The allowances, then, are credits in Reeside's account, which the defendants may use to prove his performance of the conditions of the acceptance; and they do show performance, as the amount earned would have paid his drafts if it had not been diverted.

The third instruction asked the Court to say, among other things, if the credits given by Mr. Barry, were for extra allowances, which the said Postmaster General was not legally authorized to allow, then it was the duty of the present Postmaster General to disallow such items of credit. The successor of Mr. Barry had the same power, and no more, than his predecessor, and the power of the former did not extend to

the recall of credits or allowances made by Mr. Barry, if he acted within the scope of official authority given by law to the head of the Department. This right in an incumbent of reviewing a predecessor's decisions, extends to mistakes in matters of fact arising from errors in calculation, and to cases of rejected claims, in which material testimony is afterwards discovered and produced. But if a credit has been given, or an allowance made, as these were, by the head of a Department, and it is alleged to be an illegal allowance, the judicial tribunals of the country must be resorted to, to construe the law under which the allowance was made, and to settle the rights between the United States and the party to whom the credit was given. It is no longer a case between the correctness of one officer's judgment and that of his successor. A third party is interested, and he cannot be deprived of a payment on a credit so given, but by the intervention of a Court to pass upon his right. No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute, and it may be done by the direction of the incumbent of the Department. The act of 2d July, 1836, entitled "An act to change the organization of the Post Office Department," is only affirmative of the antecedent right of the Government to sue, and directory to the Postmaster General to cause suits to be brought in the cases mentioned in the 17th section of that act. It also excludes him from determining, finally, any case which he may suppose to arise under that section. His duty is to cause a suit to be brought. Additional allowances, the Postmaster General could make under the 43d section of the act of March 2d, 1825, (3 Story, 1985;) and we presume it was because allowances were supposed to have been made contrary to that law, that the 17th section of the act of 2d July, 1836, was passed. In this last, the extent of the Postmaster General's power in respect to allowances, is too plain to be mistaken.

We cannot say that either of the sections of the acts of 1825, and 1836, just alluded to, covers the allowances made by Mr. Barry to Reeside. But if the Postmaster General thought they did, and that such a defence could have availed against the rights of the Bank to claim these acceptances, as credits in this suit, the same proof which would have justified a recovery in

an action by the United States, would have justified the rejection of them as credits when they are claimed as a set-off.

We pass to the credit claimed, and called E. F. Brown's overdraft. But why it is so called, we do not know; for certainly no overdraft occurred when he checked alone upon the contingent fund of the department deposited to his credit in the Bank. Seven thousand and seventy dollars and twenty-four cents, on the 30th of April, 1835, were deposited to his credit. By 7th of June, he had drawn of that sum three thousand and seventy-six dollars and ninety-seven cents. Then the Postmaster General directed the Bank not to pay Brown's checks, unless they were approved by Robert Johnson, the Accountant of the Department. It is in proof, that no check of Brown's was afterwards paid without Johnson's approval. On the 2d of December following, the original deposit to Brown's credit was drawn out in his checks, approved by Johnson, and it was found there had been an overdraft of something over six hundred dollars. We do not say, that an overdraft out of the Bank by authorized officers of the United States, is in any case chargeable to the United States, unless it can be shown that the money overdrawn has been applied to the use of the United States: but in the present instance, we think no proof of such application was necessary, and we cannot resist the conclusion, that the defendants are, in equity, entitled to this credit, for the proof is, that on the day that the overdraft was known, the Postmaster General wrote a letter to the Cashier of the Bank, stating that "the contingent fund of the Department was exhausted, but the public service requires that a number of bills chargeable to that appropriation, shall be paid sooner than the usual sum can be obtained from Congress; I therefore request the favour of your Bank, to pay such bills against the Department, of that character, as may be presented, with the certificate that the amount is allowed, signed by Robert Johnston, Accountant of this Department." The request was complied with, and the Bank advanced until the 14th of May, 1836, more than six thousand dollars, to pay claims on the contingent fund. In this case, as in those of more humble dealings, the course of business between parties must be used when it can apply to explain their understanding of past transactions. Nor can the inference be resisted, that when the Postmaster

[The United States *v.* Bank of the Metropolis.]

General discovered the contingent fund had been overdrawn, and requested that other overdrafts might be made on the same account, that it was an admission of the correctness of the first. We think, then, that the United States was a debtor to the defendants for Porter's draft, and Reeside's drafts, and for the overdraft on the contingent fund, principal, interest, and costs.

But it is said, though the credits claimed by the defendants shall be found to be due by the United States, they cannot be set off in this suit. This was the first instruction asked, and refused by the Court.

It is urged, that to allow them as credits in this suit is, in effect, to permit money to be taken from the Treasury, otherwise than it is directed to be disbursed by law. That the money previously held by the defendants had been passed to the account of the Treasurer of the United States by direction of the Postmaster General, in conformity with the act of the 2d of July, 1836. 4 Story, 2464. That when the defendants complied with the letter of instruction, written to them by the Postmaster General, on the 16th of July, 1836, and transferred the money then on deposit to the credit of the Department, to the Treasurer of the United States, for the service of the Post Office Department; and when they consented to receive future deposits according to a form sent, and to transact the business according to the regulations contained in the letter of the 16th of July, 1836; that the defendants cannot legally charge their claims against that account, by way of set-off in this suit.

To the foregoing objections, a brief but conclusive answer may be given. That is certainly the Treasury of the United States where its money is directed by law to be kept: but if those whose duty it is to disburse appropriations made by law, employ, or are permitted by law to employ, either for safe keeping, or more convenient disbursement, other agencies, and it shall become necessary for the United States to sue for the recovery of the fund, that the defendant in the action may claim, against the demand for which the action has been brought, any credits to which he shall prove himself entitled to, if they have been previously presented to the proper accounting officers of the Treasury, and been rejected. Such is the law, as it now stands. This right was early given by an act of Congress to all defend-

ants in suits brought by the United States. 1 Story. It has been repeatedly before this Court. The decisions upon it need not be cited. They apply to this case. The transfer of the deposit to the Treasurer of the United States; the letter of the Postmaster General directing it to be done; his regulations for keeping the account, and for disbursing it, were directory to the defendants; and their compliance with such directions, was an acknowledgment that the Postmaster General had the right to give them, as the conditions upon which they were to continue the depository of the fund. But it cannot be inferred, either from the act of 2d of July, 1836, requiring that when the revenues of the Post Office Department have been collected, that they shall be paid, under the direction of the Postmaster General, into the Treasury of the United States; or because appropriations for the service of the Department, shall be disbursed by the checks of the Treasurer endorsed upon warrants of the Postmaster General, and countersigned by the Auditor for the Post Office Department, under the words "registered and charged;" or from the declaration in the Postmaster General's letter to the defendants, that no other credit, set-off, or deduction will be admitted in this account. It cannot be inferred, that the defendants accepted the Postmaster General's letter as a contract to surrender the right secured to them by the statute, to claim credits in a suit brought against them by the United States; or that it imposed upon them any legal obligation not to do so.

From the previous and contemporaneous correspondence between the Bank and the Postmaster General, concerning these drafts, it is clear such was not the apprehension of the defendant when the account was opened with the Treasurer of the United States, in compliance with the Postmaster General's letter. That was done in compliance with the law, changing entirely the fiscal arrangements of the Department; and for that purpose the Postmaster-General was the proper organ to direct it to be done; but any condition in that letter not required by the act of Congress, under which he was acting, though officially made, is rather an evidence of what he wished to do, than a conclusion that he had the power to impose it; or that the defendants had consented to look to Congress for the reimbursement of the debt due them, and not to the Courts of justice. When the account was changed

to the Treasurer of the United States, there was a large balance on deposit to the credit of the Post Office Department. The fund, however, was not the less that of the United States, in the one case or the other. The change, then, made no difference as to the ownership of the fund, in their right to retain, if the defendants had any right at all to retain it for their debt. They had been dealing with the executive branch of the Government in a matter of money, and could not be turned to the Legislature without their consent to ask it to do as a favour, what the judiciary could settle as a right. If the defendants had supposed such was to be the consequence of carrying the fund to the Treasurer's account, it is manifest from the evidence in the case, that it would not have been done. That they did not do so, it is to be inferred also from the evidence arose from an indisposition to enforce a right until every effort had been made to obtain it by amicable adjustment; and from an indisposition to embarrass a Department which had been severely pressed, and was then just beginning to be relieved. The Postmaster General says, in his letter of March 19th, 1838, that, "excepting the refusal, in common with other banks, to pay the warrants of this Department in gold and silver, or an equivalent, commencing in May last, and the seizure of both a general and special deposit of moneys in the Treasury to meet alleged claims, under the circumstances exhibited in the annexed papers, the Bank of Metropolis has faithfully discharged its duties as a deposit bank for this Department." The circumstances alluded to are those which have been the subject of comment in this case; and it is our opinion, that they confirm the right of the defendants to the credits claimed. There was no error, then, in the Court not giving the instructions asked for, and the judgment is affirmed.

It is proper for us to say, however, if the law and the merits of the case were not with the defendants, that the Court might well have refused to give the first instruction, from the manner in which it is asked. After the evidence had been closed on both sides, the Court was asked to say, "that upon the evidence aforesaid, the defendants are not entitled, in this action, to set off against the plaintiffs' demand, the amount of acceptances aforesaid, so given in evidence by the defendants, nor the amount of the overdraft of E. F. Brown." It raises all the issues, both of

law and fact, in the case, and requires the Court to adjudge the case for the plaintiffs. This the Court could not do as there were contested facts in the case, which it was the province of the jury to decide. The Court could only have said, alternatively, what was the law of the case, accordingly as the jury did or did not believe the facts; and this, it will be admitted, would have been equivalent to a refusal of the instruction. When instructions are asked, they should be precise and certain, to a particular intent; that the point intended to be raised may be distinctly seen by the Court, and that error, if one be made, may be distinctly assigned.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States, for the District of Columbia, holden in and for the county of Washington, and was argued by counsel: on consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said Circuit Court in this cause be, and the same is hereby affirmed.