## UNITED STATES v. HADDEN et al.

### No. 11386.

United States Court of Appeals
Sixth Circuit.

Nov. 19, 1951.

Arthur W. Murphy, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., Paul A. Sweeney, and Arthur W. Murphy, Washington, D. C., Don C. Miller, and Frank E. Steel, Cleveland Ohio, on brief, for appellant.

L. C. Wykoff and John A. Hadden, Cleveland, Ohio, L. C. Wykoff, Peter Reed, and Richard C. Weiss, all of Cleveland, Ohio, on brief; Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, Samuel K. Walzer, Cleveland, Ohio, of counsel, for appellee.

Before SIMONS, ALLEN and MILLER, Circuit Judges.

SIMONS, Circuit Judge.

From the disallowance of a claim by the government in a bankruptcy proceeding for the refund of monies allegedly paid by mistake to a war contractor there emerges an issue which calls for consideration of recently enacted statutes and appears to be one of first impression. The salient facts follow:

The contractor was Union Industries, Inc., herein referred to as Union. In 1944, it entered into a contract with the Navy, Bureau of Ordinance, for the manufacture and delivery of anti-aircraft shells. Union was to furnish material but when it failed to obtain it, the government agreed to and did furnish it. Union entered upon performance and continued to perform until August 14, 1945, when the contract was terminated by the government in pursuance of the War Contract Settlement Act of 1944, 41 U.S.C.A. § 101 et seq.

On June 15, 1945, Union entered into a factoring agreement with Manufacturers Trading Corporation, herein called the

bankrupt, under which the bankrupt was to lend it money on the security of an assignment to it of Union's contract with the government. Beginning June 16, 1945, and up to January 20, 1948, the bankrupt loaned substantial sums to Union in reliance upon the assignment. The government's claim against the bankrupt is for $302,000.00 for monies paid to the assignee on Union's contract when allegedly there was nothing at the time owing upon it. The bankrupt's trustee objected to the claim and denied liability on the ground that it was an assignee of the contract in good faith without notice of any mistake in the making of the government payments. While it also denied any liability whatsoever by Union to the government, that question is not before us for reason that will later appear.

The referee's findings, approved by the Court, were that the government payments were not made under a mistake of fact; that the bankrupt had no knowledge of such mistake, if made; was not on notice of any indebtedness by Union to the government, or that the government intended to assert such claim and that subsequently to the receipt of the payments involved the bankrupt had made new loans to Union under the factoring agreement in reliance upon them.

The government's basic position is that in seeking to recover monies erroneously paid, it is not subject to the general rules of law governing the recovery of voluntary payments by one party to another; that public funds have always been zealously guarded, and that there is a long established rule that such funds wrongfully, erroneously, or illegally paid may be recovered from the person to whom the payments were made. It derives the rule from United States v. Wurts, 303 U.S. 414, 415, 58 S.Ct. 637, 82 L.Ed. 932; Wisconsin Central R. R. v. United States, 164 U.S. 190, 212, 17 S.Ct. 45, 41 L.Ed. 399, and United States v. Burchard, 125 U.S. 176, 8 S.Ct. 832, 31 L.Ed. 662. Recovery it says has not been restricted as in the case of private parties to those made by reason of fraud or mistake. It points to what it calls "the classic statement of the rule" in Whiteside v. United States, 93 U.S. 247, 257, 23 L.Ed. 882; where it was held that though a private agent acting within the scope of his general authority may bind his principal, the effect of a like act by a public agent is otherwise "for the reason that it is better that an individual should occasionally suffer from the mistakes of public officers or agents, than to adopt a rule which, through improper combinations or collusion, might be turned to the detriment and injury of the public." It says that the rule lies not in the status of the recipient but in the nature of the payer and that the important element is that public monies are involved and the risk of loss is placed upon the person who deals with the government. The bankrupt, as the recipient of the overpayments, is liable to repay the amount received unless it can establish that the rule is not applicable to it and that neither the Assignment of Claims Act nor the Contract Settlement Act affords any basis for concluding that the rule should not be here applied. It considers that both Acts express a congressional intent that overpayments should be recoverable.

The bankrupt responds that restitution may not be had from a third person without notice of fraud or mistake; that the principles of general law as set forth in the American Law Institutes, Restatement on Restitution §§ 13, 14, govern, and that such general principles of law are applicable to the government when it engages in commercial transactions—Cooke v. United States, 91 U.S. 389, 23 L.Ed. 237; United States v. Bank of Metropolis, 15 Pet. 377, 40 U.S. 377, 10 L.Ed. 774; United States v. Seaboard Airlines Ry. Co., 4 Cir., 22 F. 2d 113, 115; England National Bank v. United States, 8 Cir., 282 F. 121. It quotes from United States v. Seaboard, supra [4 Cir. 7, 10 L.Ed. 774, 22 F.2d 115] where many cases are cited: "the rule is well settled that, when the 'government * * * comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there'", and from United States v. National Exchange Bank of Baltimore,

270 U.S. 527, 46 S.Ct. 388, 389, 70 L.Ed. 717. "The United States does business on business terms."

Finally, the bankrupt urges that, literally read or rightly interpreted, the Assignment of Claims Act conferred no right of restitution upon the government and that the Contract Settlement Act specifically provides for recoupment of overpayments only from the contractor and so purposely not from its assignee, and that in the absence of specific provision by statute the ordinary rules of law must prevail.

In view of these opposed positions, based upon the terms of fairly recent statutes, it becomes necessary to consider their terms, statement of purposes, and background. Prior to the enactment of the Assignment of Claims Act in 1940, the assignment of any Claim upon the United States was void if made at any time before the liquidation of the amount due and the issue of a warrant therefor, 31 U.S.C.A. § 203. The government concedes that if Congress intended that an assignee should be in better position with respect to the government than his assignor, then, to the extent that Congress so intended, the bankrupt must prevail. It urges, however, that with respect to claims arising under a contract, subject to assignment, Congress intended that the assignee should stand in the shoes of his assignor.

It is, however, to be inferred from the language of Section 1 of the Assignment of Claims Act of 1940 that its purpose was to make it easier for government contractors to secure financing for carrying out of obligations to the government to the end that government contracts may be speedily and effectively performed. Assignment of claims by government contractors was not generally validated but were sanctioned only when they were assigned to a bank, trust company, or other financial institution, including Federal lending agencies. It is to be noted that German armies had already invaded Poland and America was looking to its military resources in the event of being drawn into a second world war. This section of the Act also provided that any contract entered into by the War or Navy Department might pro-

vide that payments to an assignee of any claim arising under the contract should not be subject to reduction or set-off and, if so, payment should not be subject to reduction or set-off for any indebtedness of the assignor to the United States arising independently of such contract. This provision is specifically urged upon us as showing that the Congress intended to protect an assignee from collateral liability to the government of his assignor and so inferentially that it was the intention of the Congress that the rights of the United States against an assignee should not be tested by general law of assignments, but the provision cuts both ways. By limiting the right of set-off, it takes the assignee out of the shoes of his assignor and gives him a limited independent status. It is also to be noted that by Public Law 30, 82d Congress, approved May 15, 1951, Congress amended the Act by providing that moneys received by an assignee shall not be recoverable by the government on account of any liability of the assignor "whether arising from or independently of contract." The government urges that inference is inescapable that Congress did not believe that the 1940 Act made the assignee immune from suit for recovery of erroneous payments. But the Comptroller General had ruled that such payments could be recovered, so the inference is equally reasonable that the Amendment was for clarification, rather than change in the law. Sen.Rept. 217, 82d Cong. 2d Sess., p. 2.

United States v. Wurts, supra, dealt with the government's right to recover payments erroneously made to the taxpayer. No question of assignment was therein involved and the case was decided in 1938, before the Congress had undertaken to validate assignments of claims against the government. Whiteside v. United States, supra, dealt with payments unauthorized by law as likewise did Wisconsin Central R. R. v. United States, supra.

When we come to a consideration of the Contract Settlement Act, the overall purpose of the Congress becomes much clearer. There in Sec. 1 is the specific declaration that the objectives of the Act are to facilitate maximum war production during the war, to expedite reconversion from war

production to civilian production as conditions permit and to assure to prime contractors and subcontractors, small and large, speedy and equitable final settlement of claims under terminated war contracts and adequate interim financing until such final settlement. A secondary purpose was also declared to be the use of all practicable methods "*compatible with the foregoing objectives*" to prevent improper payments and to detect and prosecute fraud. By Sec. 9(a), a contracting agency was permitted to make advance or partial payments to any war contractor on account of any termination claim, or claims, and to authorize or ratify such advance upon such *conditions* as it deemed necessary to insure compliance with the provisions of the Section. By Sec. 9(b), a war contractor could be permitted to make advances, or partial payments, to another war contractor within certain limitations. But the sole provision of the Act in protecting the government for such advances was that any amount in excess of the amount finally determined to be due upon the termination claim was to be treated as a loan from the government to the *war contractor* receiving it, payable upon demand with certain penalties. It was also provided that where the advance or partial payment was made by a war contractor to another war contractor and authorized and ratified, the war contractor should not be liable for any excess payment in the absence of fraud on his part and should receive payment or credit from the government for the amount of such excess payment.

From this, it would seem to follow that the primary concern of the Congress in a grave national emergency was to insure the prompt execution of government contracts. We were then engaged with all our resources and available man-power in a great world war and the attention of the country and the Congress was focused upon winning that war, rather than upon the supplying of peace time needs. The safeguarding of public funds from erroneous overpayment to contractors was important, but losing the war would have been catastrophic. Time was vital to a nation, unprepared. To speed production even at another hazard in the inevitable waste of war was the prime objective. Munitions must flow to Army, Navy, and Air Force, in a continuous stream, and every item be at the time and place needed. It may well be that the aphorisms of Poor Richard [1] have left an influence upon our public thinking in times of emergency.

In a time of unprecedented expansion of government power and when we are asked to accept the concept of a "Welfare State," there would seem to be little profit in undertaking to trace the shadowy line that separates the truly sovereign functions of government from those that are purely business or commercial. The government having power by Act of Congress to wage war, it has now become a truism that it has also the obligation to wage it successfully. So, much may be said of the authority of government, in its sovereign capacity, to equip the Army, Navy, and Air Force, it has sovereign power to raise and establish. We do not base decision upon a philosophic consideration of constitutional limitations upon sovereign national power.

We have already indicated that whether the government owed Union or Union owed the government at the time of the payments is not here in issue. This derives from the fact that the district court had no jurisdiction over that controversy. Sec. 13 (b) of the Contract Settlement Act provides that whenever any war contractor is aggrieved by the findings of a contracting agency he may, at his election, appeal to the Appeal Board in accordance with subsection (d), or bring suit against the United States in the Court of Claims. Such suit has already been brought by the bankrupt. The status of the account will there be decided and the fact of overpayment there determined. The appellant here but seeks a remand to the Court below with direction to order the amount of the claimed overpayments held in the estate subject to further order of

---

1. For want of a nail, a shoe was lost
   For want of a shoe, a horse was lost
   For want of a horse, a rider was lost
   For want of a rider, a battle was lost

For want of a battle, a kingdom was lost!

Benjamin Franklin in *Poor Richard's Almanac.*

that court after the conclusion of the suit in the Court of Claims, or to order the amount of the overpayment paid to the United States without prejudice to the Court of Claims acting.

The conclusions at which we have arrived are: that in view of the express purpose of the Acts involved, the inescapable inferences of the urgency which impelled the Congress, in the light of the international situation, to effectuate such purpose, and its failure expressly or by reasonable inference to reserve a right to recover erroneous payments from assignees, no such right exists. The controversy is, therefore, governed by the general law of restitution, and our decision is that the findings and conclusions of the referee as approved by the Court are sound, and the judgment below is

Affirmed.