46 U.S. 382 (____)
5 How. 382
THE UNITED STATES, PLAINTIFFS IN ERROR,
v.
THE BANK OF THE UNITED STATES.
Supreme Court of United States.

*386 The cause was argued by Mr. Clifford (the Attorney-General) and Mr. Nelson, for the United States, the plaintiffs in error, and by Mr. Sergeant, for the Bank.
Mr. Clifford assigned five causes of error, viz.: &mdash.
*394 Mr. Justice CATRON delivered the opinion of the court.
The United States sued the Bank of the United States for a dividend on stocks held by the government in the bank, and the defendant pleaded and relied in defence on a set-off, being the damages claimed by the defendant of fifteen per cent. on a protested draft in the form of a bill of exchange, drawn by the government of the United States on the government of France, for a sum of money due from the latter government to the former, by treaty stipulations, to obtain possession of which the draft was drawn. The bank was the payee and original holder. The *395 holders at the time of protest (Messrs. Rothschilds of Paris) caused it to be protested for non-payment; and Hottinguer & Co. intervened immediately after, and took up the draft for the honor of the bank. The corporation refunded to Hottinguer & Co. the amount advanced, including interest and charges, together with one half per cent. commissions, and thus again became possessed of the draft.
The Circuit Court, on a former trial, held that the damages claimed as a set-off depended on a statute of Maryland of 1785; that by the statute the holder at the time of protest alone could demand damages from any previous party to a bill, and that if he failed to do so, and recovered less from any previous indorser, the latter could only recover the amount actually paid (with interest and charges accruing subsequently) from the drawer; and therefore the bank could set up no claim by force of the statute of Maryland, taking its own assumption to be true, that this was a legal bill of exchange, and properly subject to protest. This instruction altogether rejected the defence relied on, and the jury found for the plaintiffs; and from that decision the defendants prosecuted a writ of error to this court. When the cause came before us in 1844 (2 Howard, 711), this single question was presented for our determination; nor could this court decide any other question; and such was the unanimous opinion of the court, although the judges then present differed as regarded the true construction of the statute of Maryland; the majority holding the construction of the Circuit Court to have been erroneous, and that the bank, as payee, on taking up the draft from Hottinguer & Co., had the same right to demand damages under the statute that the holder had at the time of protest. The court, however, when giving its opinion, threw out some suggestions on the structure of the bill; first remarking, that, "before we consider the rulings of the court excepted to, it may not be improper to notice the structure of the bill, which has been much commented on by the counsel, though, not having been excepted to by the government, it is not a matter for decision." The instruction given cut off every other question the government might have raised in opposition to the set-off claimed; and as this court, when acting as a court of errors, can only legitimately revise the questions of law that have been raised and decided in the Circuit Courts, it must of necessity, on a second writ of error being prosecuted, have power to revise such rulings of the court below on the second trial as affect the merits of the controversy, and to pass on the questions not previously presented, as open questions, in the particular cause. However high the regard of judges that did not concur may be for the views entertained and expressed by other judges, on a question of law not brought up for decision, still it is impossible to recognize such views as binding authority, consistently with the due administration of justice; as by doing so the merits of *396 the controversy might be forestalled, without proper examination. We therefore feel ourselves at liberty to treat of the structure and character of the instrument before us as an open question. And so, also, we deem the question open, whether the statute of Maryland subjected to protest and damages a government. The statute provides,  "That upon all bills of exchange hereafter drawn in this State on any person, corporation, company, or society in any foreign country, and regularly protested, the owner or holder of such bill shall have a right to so much money as will purchase a good bill of the same time of payment, and upon the same place, at the current rate of exchange of such bills; and also fifteen per cent. damages upon the value of the principal sum mentioned in such bill, with costs of protest, together with legal interest," &c. The United States refunded to the bank, on the return of the draft, the principal sum, together with all the charges actually incurred by the bank, and the interest accruing from the date of drawing to the time when the money was refunded; but refused to pay the fifteen per cent. damages claimed by the bank. This refusal was not founded on the true construction of the Maryland statute; the government insisting it had no application to the transaction, but that the drawing was of nation upon nation, and not governed by the law merchant; and that the form of one of the instruments making up the transaction did not and could not alter its character or legal effect, so as to bring it within the law merchant. That the government was only bound to do equity to the bank to the extent of the amount refunded to Hottinguer & Co. And these conflicting assumptions make up the question we are now called on to determine, as will be seen by referring to the third and fourth instructions asked to be given to the jury, on part of the plaintiffs, on the second trial; they are as follows: 
"3. That the bill in question, being drawn by one government upon another, and upon a particular fund, is not a bill of exchange within the legal meaning of the terms, and is not embraced by the statute.
"4. That the defendants, being indorsers of the bill, and not the holders or owners at the time of protest, are not entitled to the damages, since they have not paid them."
Being refused, the judge stated to the jury, that "these questions appear to me to have been determined by the Supreme Court of the United States in the present cause in favor of the defendants"; and further remarking, that, "if I am mistaken in their views on this, it will be corrected by a reëxamination of the cause in that court."
That the judge was mistaken as regarded the questions arising on the third instruction, we have already stated; but in regard to the fourth instruction, the charge was proper, as the question presented by it had been decided.
*397 Suppose, then, a bill of exchange could be drawn by the government of Maryland, or by the government of the United States in this District, as the successor of Maryland, on the government of France; would the statute of Maryland give damages to a holder in case the bill was dishonored by France, and formally protested? The statute provides for damages upon all foreign bills drawn in that State, "on any person, corporation, company, or society."
Is the government of France either a person, corporation, company, or society, within the meaning of the act? If it is, and was indebted, and could be drawn on and protested, then it follows that the drawer of the bill (in such an instance as this), on taking it up and paying the damages, could lawfully demand from France, as drawee, the damages paid, and rightfully enforce the demand by the sword, if payment was refused; as the demand would be a perfect right, and this the ultimate remedy. In our opinion, Maryland, by her act of 1785, never contemplated the idea that a foreign government should be subject to be drawn upon by bills of exchange, and to protest and damages as incidents, like individual persons, or trading companies, or corporations; but that the statute had reference to the latter only; and that therefore this bill, on its face, "is not embraced by the statute," in the language of the rejected instruction.
The second consideration arising on the instruction involves the structure and character of the instrument, not so much in form, as in substance; for the name of the instrument cannot change its nature and character. The draft was drawn by one government on another, and of necessity accompanied by other documents, and the question is, was it a negotiable bill of exchange, in the legal meaning of the terms. The Circuit Court held that it was; and this is the prominent legal point in the cause, or at least has been so treated at the bar, and on which this court has bestowed much consideration.
A bill of exchange is an instrument governed by the commercial law; it must carry on its face its authority to command the money drawn for, so that the holder, or the notary, acting as his agent, may receive the money, and give a discharge, on presenting the bill and receiving payment; or, if payment is refused, enter a protest, from which follows the incident of damages. But if no demand can be made on the bill standing alone, and it depends on other papers or documents to give it force and effect, and these must necessarily accompany the bill and be presented with it, it cannot be a simple bill of exchange, that circulates from hand to hand, as the representative of current cash.
The draft in question was drawn for 4,856,666.66 francs; being moneys owing and shortly to become due from France to the United States, according to a treaty stipulation; and these facts are distinctly set forth on the face of the draft, and by indorsements on it. *398 The paper was signed by the Secretary of the Treasury of the United States, and addressed to the Minister and Secretary of State for the Department of Finance of the kingdom of France, and was payable to the order of Samuel Jaudon, cashier, &c. The mere signature of our Secretary of the Treasury could not be recognized by the French government as conferring-authority on the holder to demand payment. The transaction being one of nation with nation, he who demanded payment must have had not only the authority of this nation before he could have approached the French government, but that authority must have been communicated by the head of this government through the proper department carrying on our national intercourse, which was the State Department. Accordingly, of even date with the draft (7 February, 1833), an instrument was drawn up reciting the fact of indebtment, and cause thereof; the amount due; the authority conferred by an act of Congress on the Secretary of the Treasury to apply for the money in such manner as he might deem best; the fact and manner of drawing for it; and then comes the official authority to the payee to receive the money, in these terms: 
"Now, therefore, be it known, that I, Andrew Jackson, President of the United States, do ratify and confirm, and approve the drawing of the said bill by the Secretary of the Treasury aforesaid, and do hereby authorize the said Samuel Jaudon, or his assignee of the said bill, to receive the amount thereof; and on receipt of the sum therein mentioned, to give full receipt and acquittance to the government of France for the said first instalment, and the interest due on all the instalments, payable on the said second day of February, by virtue of the said convention; and I, Andrew Jackson, President as aforesaid, do hereby ratify and confirm all that may be lawfully done in the premises.
"In testimony whereof, I have caused the seal of the United States to be hereunto affixed. Given under my hand, at the city of Washington, the seventh day of February, in [L.S.] the year one thousand eight hundred and thirty-three, and of the independence of the United States of America the fifty-seventh.
 ANDREW JACKSON,
 "By the President: EDW. LIVINGSTON,
 Secretary of State."
This accompanied the draft, and was placed in the hands of the payee, and no doubt passed through the hands of the different indorsees. Still, neither the power more than the draft could be presented to the French government by a mere individual who was holder, or by a notary public, and therefore, on the next day after the draft and power bear date, the Secretary of State of our government addressed a despatch to our chargé d'affaires and representative at the French court, in the following terms: 

*399 "Department of State, Washington, 8th February, 1833.
"Nathaniel Niles, Esq., Paris.
"SIR:  The Secretary of the Treasury, in conformity with the provision of a law of the last session of Congress, yesterday drew a bill upon the Minister of State and Finance of the French government, for the first instalment and the interest thereupon, and for the interest upon the remaining instalments; which interest is stipulated to be paid by that government to this in twelve months from the date of the exchange of the ratification of the late convention between the United States and his Majesty the King of the French. The bill is drawn in favor of Samuel Jaudon, cashier of the Bank of the United States, or order, and will go accompanied, to the assignee thereof in France, by a full power from the President, authorizing and empowering him, upon the due payment of the same, to give the necessary receipt and acquittance to the French government, according to the provision of the convention referred to.
"You will take an early opportunity, therefore, to apprize the French government of this arrangement.
 "I am, Sir, respectfully, your obedient servant,
 EDW. LIVINGSTON."
Until the French government was thus officially advised, the bill and accompanying power combined were valueless in the hands of the holder, as against France.
It follows, as we suppose, from the character of the drawer and the drawee, and the nature of the fund drawn upon, that this transaction could not be governed by the commercial law; much less by a statute of Maryland, which happened to be in force in the District of Columbia, where the draft was drawn.
But it is insisted, and with much plausibility, that as between the bank as payee, and the United States as drawer, no such objections can be alleged by the United States; they having assumed the draft to be a bill of exchange, and dealt with it as commercial paper, are bound by the assumption. Still, the question meets us, that no form of draft could authorize a legal demand upon the drawee (France) on the face of the draft. So far from being a simple paper, carrying its authority to receive the money with it, the parties now before the court conceded, at the time the drawing took place, by obtaining the power, that the right to receive the money did mainly depend, and must depend, on the power signed by the President, and countersigned by the Secretary of State, with the seal of the United States attached, and the communication of the facts in official form, and through the proper channel, to the government of France, that is, through its Department of Foreign Affairs. These were the conditions and contingencies with which the draft was encumbered. They were legal consequences, apparent *400 on its face, and are yet more apparent by the accompanying facts that took place at the time of drawing.
Again. This controversy is between the original parties; the law governing the dealing, each was bound to know; the facts they did know equally well; and if a mutual mistake was made in supposing that a negotiable commercial instrument could be founded on our claim against France, this mistake cannot change the commercial law, which in our opinion could not be made to apply to the subject-matter of drawing, nor in any form of instrument founded on the subject-matter.
The principal argument adduced to sustain the set-off claimed is founded on the fact, that by an act of Congress the Secretary of the Treasury had a discretion to adopt any appropriate means to obtain the money, and that a bill of exchange was an appropriate means. To this assumption it may be answered, that France was not bound by the act of Congress, but by the treaty; it stipulated, "that the indemnity of twenty-five millions of francs should be paid, in six annual instalments, into the hands of such person or persons as should be authorized to receive it." We repeat that this authority was to come from our government to the French government; was to pass through the Department of State here, and through the Department of Foreign Affairs there, and thus only could it reach the Minister of Finance, M. Humann. Our Secretary of the Treasury could not communicate with the Minister of Finance, nor with any other functionary of the French government, and therefore the bill drawn by Mr. McLane on M. Humann, standing alone, was idle as waste paper, notwithstanding the act of Congress, in so far as the French government was concerned. Nor had M. Humann any power to pay the money, had it been in the treasury, until instructed to do so by the Department of Foreign Affairs.
1. For these reasons, we are of opinion that the question on the structure of the bill is an open question, because for the first time presented to this court for decision.
2. That the statute of Maryland, of 1785, in its terms, does not embrace a bill of exchange drawn on a foreign government.
3. That a bill of exchange in form, drawn by one government on another, as this was, is not, and cannot be, governed by the law merchant; and that therefore it is not subject to protest and consequential damages.
And on these grounds we order that the judgment of the Circuit Court be reversed, and that the cause be remanded to that court for another trial thereof, on the principles stated in this opinion.
Mr. Chief Justice TANEY filed the following memorandum: 
The Chief Justice withdrew from the bench in the argument of this case, having given an official opinion, when he was Attorney-General of the United States, against the claim made by the *401 bank, and concurring altogether with the above opinion given by the court.
Mr. Justice McLEAN.
I dissent from the opinion of the court. No point is made in this case which was not elaborately discussed and substantially ruled in the same case, reported in 2 Howard, 711. It is true, the structure of the bill, and the liability of the government to the damages claimed, not being points made in the former bill of exceptions, were not authoritatively adjudged. But these points were so connected with the construction of the Maryland statute, the question then before the court, that neither the counsel nor the court could escape their consideration. No other instrument than a foreign bill of exchange is embraced by the statute, and if the government be not liable to damages on a protested bill, no decision could have been given against it.
The points were as fully and as ably argued then, as they have been at the present term. The addition of one learned counsel at the bar is the only change in the advocates. But the changes on the bench show the uncertainty of life, and the emptiness of human hopes. Two judges, distinguished for their great learning and ability, who participated in the former judgment, have gone to their account; ill health causes the absence of another, and the opinions of the two now present remain unchanged. We submit, as we are bound to do, to the views of our four learned associates who now decide this case.
It is insisted that the bank did not purchase the bill of exchange from the government, but acted as its agent, using the bill as an instrument through which to perform its agency.
By the fifteenth section of its charter the bank, when required by the Secretary of the Treasury, was bound "to give the necessary facilities for transferring the public funds from place to place within the United States or Territories, without charge." But this duty was limited to transfers within the Union, and lid not extend to foreign countries.
The correspondence between the Secretary of the Treasury and the president of the bank, in relation to this bill, shows a purchase of it by the bank. In his first letter to the bank, dated the 31st of October, 1832, the Secretary of the Treasury states the amount due under the French treaty; that it was made his duty to have the amount transferred to the United States, and the views of Mr. Biddle as to the mode of transfer were solicited. In his answer Mr. Biddle says,  "The simplest form would be the sale of a bill on Paris, drawn by the Secretary of the Treasury"; that "the bank has already in Paris a larger sum than it has any immediate use for, yet it is not indisposed to increase it, because it may hereafter have occasion for the fund, and because it is believed that, if *402 the terms can be made acceptable, the purchase of the whole by the bank would be the best operation for the government." The rates of exchange are then stated, and a proposition to purchase the bill at a certain per cent.
On the 26th of January ensuing, the Secretary says he is ready to draw the bill, and adds,  "I presume the bank is still disposed to purchase, and on the terms offered in your letter of the 5th of November." And also he says,  "It is desirable that the credit be given to the treasurer by the bank, on receiving the bill."
To this letter Mr. Biddle replies, that the rate of exchange has declined between England and France, and that the bank could not take the bill on the terms at first proposed. On the 6th of February the new terms were accepted, and on the following day the bill was transmitted, and its proceeds were placed on the books of the bank to the credit of the government.
These facts show a proposal to sell the bill by the Secretary, and an agreement to purchase it by the bank at a certain per cent.; that the bill was drawn and forwarded to the bank, and that for the amount of it a credit was entered to the government. In the face of these statements, which show a purchase of the bill beyond all doubt, it is extraordinary that the fact should be controverted.
It is contended that the bill, "under the circumstances stated in the record, is not a bill of exchange, and is not embraced by the Maryland statute of 1785."
The Secretary of the Treasury proposed to sell a bill of exchange to the bank, and the bank agreed to purchase a bill. On its face it is called a bill of exchange, and it was negotiated as such by the bank to Baring, Brothers, & Co., of London, and by them to N.M. Rothschild, who indorsed it to Messieurs D. Rothschild, Brothers, of Paris. When the bill became due, a demand of payment was made on the drawee, and a protest for non-payment, which was followed by due notice to the drawer. The government paid the cost of protest and other expenses to the bank, and also the commissions charged by Hottinguer & Co., who took up the bill, supra protest, as the agents of the bank; but the fifteen per cent. damages given by the Maryland statute were refused. And in a letter to the Secretary of the Treasury, the Attorney-General says,  "I have carefully examined the claims presented by the Bank of the United States, on account of the protest of the bill of exchange drawn by you on the French government," &c. "The account," he says, "stated by the bank, if supported by proper vouchers, appears to be correct, with the exception of the claim of fifteen per cent. damages on the amount of the bill."
But now it seems that these eminent civilians and bankers were ignorant of the legal import of this instrument,  men who had been all their lives conversant with bills of exchange, and who had used them in their moneyed operations annually, to an amount equal to, if *403 not greater than, the revenue of this government. Yet these men, the richest and most experienced bankers in the world, were mistaken in calling and treating this paper as a bill of exchange. And the government, too, were reprehensible for paying the costs of protest, for such costs could be charged only on a bill of exchange.
Against all this knowledge, experience, and action, it is now contended that the paper is a mere assignment, or any thing else than a bill of exchange. That designation is repudiated, not the less zealously for having been the result of second thought.
But what are the new lights shed upon this question?
Two documents are found in the present record, which were not before the court at the former argument; and these, it is said, have a material bearing on the case. The first is a letter dated 8th February, 1833, from the Secretary of State to Mr. Niles, our chargé d'affaires at Paris, informing him that a bill had been drawn on the French government for the first instalment and interest under the treaty, in favor of Samuel Jaudon, cashier of the Bank of the United States, and requesting that notice should be given of the arrangement to the French government.
This is nothing more than a letter of advice, which usually precedes a bill of exchange, of which the payee in this instance had no knowledge. It, however, conduces to show the nature of the transaction, as not only the substance of a bill of exchange was regarded, but also its form and accompaniment.
The other document was under the seal of the United States, and signed by the President and Secretary of State. It stated the substance of the treaty; the act of Congress authorizing the Secretary of the Treasury to have the instalments, as they became due, transferred to the United States; and that the Secretary had drawn a "bill on the Minister and Secretary of State for the Department of Finance of the French government, payable at sight, for four millions eight hundred and fifty-six thousand six hundred and sixty-six francs and sixty-six centimes, being the amount of the first instalment, payable to the United States, under the said convention, on the second of the present month of February, and of the interest which is payable at the same time; which bill is payable to Samuel Jaudon," &c., and the President ratifies the act of drawing the bill, and the receipt which shall be given, &c.
Now this paper is supposed to take away from the bill of exchange its character as a commercial instrument. It can have no other effect than to show that the Secretary had authority to draw the bill. It was no part of the bill of exchange, and indeed was not necessary to its negotiability. The indorsement of Jaudon implied an undertaking that he was the cashier of the bank, and that the bill was genuine and would be paid. No one can doubt that the payment of the money by the French government on the bill, without any additional evidence, would have been good. The bill upon its face *404 was perfect, and authorized the holder to receive and receipt for the money.
At most, the document can only be considered as authenticating the law under which the Secretary acted in drawing the bill. And this was all that the French government, under any circumstances, could require. But suppose this paper was a power of attorney, signed by the President, authorizing the Secretary to draw the bill; would that change or in any way affect its commercial character?
Any person may draw, accept, or indorse a bill by his agent. A partner may indorse for the firm. And this authority may be by parol or writing not under seal. So a corporation may draw by its agent. Banks are in the constant practice of drawing bills through their cashiers. And has it ever been supposed, that, if evidence accompanied or was attached to the bill of the authority of the drawer, it impaired its commercial properties? Mr. Chitty says, in his Treatise on Bills (p. 27),  "Where a bill is not signed by the party himself, the party taking it must first satisfy himself that the agent had power so to act for the supposed principal." In the case of the East India Company v. Tritton, 3 Barn. & Cres. 280, three bills upon the East India Company were payable to Hope or order; they got into possession of Card, who indorsed them for Hope. Card had a power of attorney from Hope, but it was not sufficient to warrant these indorsements. This power being seen by the holders of the bill, they were bound by it, as having notice of its extent.
But a bill drawn by an agent, under a power, was never supposed to be less a bill than if it had been drawn by the principal. And in such cases the assignee has only to satisfy himself that the drawer acted under a proper authority. This no more vitiates the bill, than evidence of the genuineness of the signature of the drawer. The bill in question was complete upon its face, and it is inconceivable to me how the paper signed by the President can affect it.
In the argument it is supposed that, in drawing this bill, the government acted in its sovereign capacity. The idea of attaching sovereignty to all the agencies of the government, however exercised, is as novel as it is unconstitutional. Cover every transaction of the agents of the government by the attributes of its sovereignty, and a despotism, characterized by the grossest acts of injustice and oppression must result.
A bill of exchange derives all its properties from the commercial law. It is a most convenient instrument for the transfer of funds from one country to another. And its chief and only value, in this respect, arises from the legal principles with which it is invested, and which regulate the duties and liabilities of those who become parties to it. In negotiating such an instrument, the government does not act in its sovereign capacity. It becomes subject, like all other parties to the bill, to the commercial principles which govern it.
*405 In the case of the United States v. Administratrix of Barker, 12 Wheat. 559, it was held, that "whenever the government of the United States, through its lawfully authorized agents, becomes the holder of a bill of exchange, it is bound to use the same diligence in order to charge the indorser as in a transaction between individuals." And in that case the indorser was held to be discharged by the negligence of the government. And again, in the United States v. Bank of the Metropolis, 15 Peters, 392, the court say,  "When the United States, by its authorized officer, become a party to negotiable paper, they have all the rights and incur all the responsibility of individuals who are parties to such instruments. We know of no difference except that the United States cannot be sued."
These decisions, and many others that might be referred to, put an end to the assumption, that a bill of exchange drawn by the government is an act of sovereignty, or any thing different in principle from a bill drawn by an individual. Whether drawn by the government or an individual, a bill of exchange is the same commercial instrument, and subject to the same law. No principle is better settled than this by the decisions of this court.
But it is supposed that there is something in the character of the drawee, the French government, which destroys the commercial character of the bill. This position is as unsustainable as that of the character assumed for the drawer. The bill was drawn on M. Humann, the Minister of Finance of the French government. The money was due, and the payment of it was subject to no contingency from the face of the bill, nor from any circumstance connected with it. The drawer guaranteed the payment of the bill on presentation by the holder, under all the responsibilities which the law attached. A demand, protest, and notice were the only conditions on which these responsibilities were to become fixed. These conditions have been performed by the bank, and the government has acknowledged its liability by paying a part of the damages claimed. But throwing itself upon its sovereignty, the government refuses to pay the damages claimed under the statute of Maryland, on the ground that the instrument is not a bill of exchange. If this ground be true, the costs of protest should not have been paid by it.
It is contended, that, as the question is now here, between the original parties to the bill, the bank may be supposed to have taken the bill under a full knowledge that it might not be paid by the French government; and could not be paid by it, unless the Chambers should make an appropriation. And from this knowledge it is inferred, that the bank took upon itself the risk of the punctual payment of the bill. This assumption is shown to be unfounded by the fact, that the government, on being notified of the protest, immediately returned the money to the bank which it had paid on account of the bill. Now if there had been any understanding, express or implied, such as is presumed, in regard to the punctual payment of *406 the bill, would the government have done this? There can be but one answer to this question.
There was no doubt in the minds of the original parties to this bill, that it would be paid on presentation. What was the language of this government on receiving notice of the protest? Was the failure of the French Chambers to make the appropriation received as an apology for the dishonor of the bill? That government was informed, in terms not to be misunderstood, that no excuse for a delay of payment could be received. That the obligation of the French government was absolute, and in no degree dependent on the will of the Chambers; and an immediate payment was required. The bank, shortly after the receipt of this bill, indorsed it to Baring, Brothers, & Co., in London. This affords the highest evidence that the bank believed the bill would be honored.
It is argued that the French government did not subject itself to a bill of exchange, and consequently to the payment of damages on a default of payment. This may be admitted, and yet it does not reach the question. The bill was not presented until the money was due, and by drawing it our own government undertook that it should be paid. This is as well settled as any other principle in the commercial law.
It seems to be considered that the case might have been stronger against the government, had it been made by an indorsee of the bill. This cannot be correct. Every indorsee, from the face of the bill, had all the notice which can be charged against the bank.
But it is contended that the bill was drawn on a particular fund, and therefore was not a bill of exchange.
It is admitted, if the payment of the bill is made to depend upon any contingency, it is not a bill of exchange. In the language of Mr. Chitty,  "If the payment is to depend on the sufficiency of a particular fund, the bill or note will be invalid." The case of Jenny v. Herle, 2 Lord Raym. 1361, was much relied on in the argument. "Herle sued Jenny upon a bill drawn by him upon Pratt, and payable to Herle, as follows:  `Sir, you are to pay Mr. Herle £1945 out of the money in your hands belonging to the proprietors of the Devonshire mines, being part of the consideration-money for the purchase of the manor of West Buckland.' Herle had judgment in the Common Pleas; but upon a writ of error, the Court of King's Bench held that this was no bill of exchange, because it was only payable out of a particular fund, supposed to be in Pratt's hands, and the judgment was accordingly reversed."
The decision in that case did not turn upon the words on the face of the bill, "being part of the consideration-money for the purchase of the manor of West Buckland"; but on these,  "You are to pay Mr. Herle out of the money in your hands belonging to the proprietors of the Devonshire mines." The former words here cited in effect are the same as those used in the French bill, showing *407 the consideration on which it was drawn; but in Herle's case these words constituted no objection to the bill, and were not referred to by the court. The case turned exclusively on the direction to "pay out of the money in your hands belonging to the proprietors of the Devonshire mines." Had these words been omitted, the bill would have been good. So that the case of Herle, so much relied on by the plaintiffs' counsel, does not show the invalidity of the French bill.
The bill in Herle's case, in the language of the court, was payable out of money supposed to be in Pratt's hands. Consequently it was payable out of no other fund. And if the fund supposed to be in Pratt's hands was not there, then the bill was not payable. Compare this with the French bill:  "Sir, I have the honor to request you to pay at sight of this my first of exchange, &c., to the order of Samuel Jaudon, cashier of the Bank of the United States, the sum of four millions eight hundred and fifty-six thousand six hundred and sixty-six francs sixty-six centimes, which comprises the sum of 3,916,666.66 francs, constituting the amount of the first payment to be made to the United States, by virtue of the convention concluded between the United States and France, the 4th of July, one thousand eight hundred and thirty-one (deduction made of the amount of the first payment, reserved to France by said treaty), and the additional sum of nine hundred forty thousand francs, for a year's interest at four per cent. upon the entire sums payable to the United States, dating from the day of the exchange of ratification to the second of February, 1833."
Now there is not on the face of this bill any intimation out of what fund the French government should pay it. It specifies on what account the bill was drawn, showing the am was due; but this does not affect the character of the bill. The instalment "was referred to," in the language of Mr. Chitty, "in order to show the consideration, and not to render the payment contingent."
In Burchell, Administrator, &c., v. Slocock, 2 Lord Raym. 1545, the action was on a promissory note, whereby the defendant promised to pay to A.B. £101 12s. in three months after the date of the said note, "value received out of premises in Rosemary Lane, late in the possession of G.H. The court, on demurrer, held this to be a promissory note within the statute." And so in Hausoullier v. Hartsinck, 7 Term, 733, the defendant promised to pay ____, or bearer, £25, being a portion of a value as under deposited in security for the payment thereof. Upon a special case being reserved, the court said they were clearly of opinion, that though, as between the original parties to the transaction, the payment of the notes was to be carried to a particular account, the defendants were liable on these notes, which were made payable at all events.
The question is, whether the payment of the bill is made to depend *408 upon any contingency. Now, it is clear this is not done in the French bill. It is made payable absolutely, without any condition expressed or implied.
The maker of a note promised to pay A.B. eight pounds, so much being to be due from me to C.D., my landlady, at Lady-day next, who is indebted in that sum to A.B. Was held not to be conditional. Chitty on Bills, 139. Now, in this instrument the consideration is stated; but that did not vitiate the note. The French bill states nothing more, than that the amount drawn for was due by treaty. And yet this is supposed to destroy its negotiable character. A decision to this effect would, in my judgment, introduce a new principle into the law governing bills of exchange.
Is the bank entitled, under the statute of Maryland, to the fifteen per cent. damages?
The argument that the State of Maryland did not intend to subject her sovereignty to the provisions of the statute is entitled to but little consideration. The interest involved does not reach the sovereignty of the State; and it is sufficient to say, there is no exemption of the interests of the State in the statute; and in passing it, the legislature intended, as in the enactment of every other law, that all legal effect should be given to it.
The words of the statute are, "that upon all bills of exchange hereafter drawn in this State on any person, corporation, company, or society in any foreign country," &c.; and it is intimated that these words do not embrace a foreign government. In answer to this, it may be said the bill is drawn on M. Humann, and is literally within the statute.
From the cases above cited, it is clear that the government, in drawing or negotiating a bill of exchange, subjects itself to all the liabilities of an individual; consequently it is liable to the fifteen per cent. damages, under the Maryland statute, if the bank is entitled to them. These damages were considered by this court in the former decision as designed by the statute to cover reëxchange. This construction is opposed, and it is argued that reëxchange is provided for in the statute, where it declares that the holder of a protested bill "shall have a right to receive and recover so much current money as will purchase a good bill of exchange of the same time of payment, and upon the same place, at the current exchange of such bill." And the fifteen per cent. damages in this view are considered as a penalty.
Instead of covering reëxchange by the above provision, the legislature intended to give the holder of the protested bill the money he paid for it, varying only as the rate of exchange should be at the time. If the rate of exchange at the protest of the bill was lower than when it was purchased, the holder, under the statute, would recover less than he paid for it; but if exchange had risen, he would recover more. Now, this exchange is limited to this *409 country, and therefore cannot have been intended as reëxchange. Reëxchange is a bill drawn at the place of payment of the protested bill, which shall sell for the amount of such bill. The holder of the French bill, on its protest, was entitled, on commercial principles, independently of the statute, to a bill on this country which would sell at Paris for the amount of the protested bill. This would be a very different sum from that which was paid for the bill in this country. The reëxchange depends upon the state of trade between the two countries, direct and circuitous, the money market, always regulated by the demand and supply, and other circumstances of a local character, which show that the price at which the bill was purchased in this country can never be the price at which a bill on this country would sell at Paris, or in any foreign country. This fact being known to the legislature of Maryland, they could not have intended by the above provision to cover reëxchange. The statute gives to the purchaser of the bill the amount he paid for it, with the small variation stated, and nothing more. The fifteen per cent. damages were given in lieu of reexchange, and not as a penalty. This is the view taken by the court in its former decision.
It is said that the bank, not having paid damages on the bill, is not entitled to them. The bank, having negotiated the bill, was responsible for its payment, with damages. And after the protest, the agents of the bank supervened, and paid the amount of it to the holder. The propriety of this payment is not questioned. By this act, the bank became the holder of the bill, not as indorsee, but as the original payee. In effect, this ownership obliterated and annulled the indorsements on the bill. The bank, as the holder, could look to no one but the government for payment. And payment to the bank in this country was made, shortly after notice of protest was received.
But the damages given by the statute have been withheld. Had the bank never negotiated the bill, and made a demand of payment, and protest for non-payment, with regular notice, the right to the damages claimed could not have been contested. And this is the precise condition of the bank. It is the holder, having paid the amount of the bill at Paris.
The large amount of the damages claimed has been adverted to in the argument. This should have no influence on the legal questions that arise.
Suppose the bank had not taken up the bill after protest; is there any doubt that the holders could have recovered damages from their indorsers, and they from the bank? This would have subjected the bank to the payment of the damages given by the law of the place where the bill was first indorsed. But this circuitous course was prevented by the payment of the bill. It thus appears that the bank paid this large sum of money in Paris, unexpectedly, *410 which in the nature of things must have subjected it to great inconvenience and loss. By the payment, the credit of the government, as the drawer of the bill, was sustained, and the eventual liability of the bank for principal and damages anticipated.
Now, as between individuals, this would entitle the holder of the bill to the fifteen per cent. damages. And it is equally clear and just, that the bank should receive the same. There has been paid to it by the government the principal, costs of protest, and the commission charged by Hottinguer & Co. as the agents of the bank, who took up the bill, but not one cent has been paid to the bank for the advance of the money at Paris. On the principles of equity, independently of the statute, the bank is entitled to the difference in value of the sum paid by it in Paris, and the sum received by it from the government in this country. This is reexchange, which the fifteen per cent., in my opinion, was intended to cover. Of this opinion was the court which formerly decided this case.
I think the judgment of the Circuit Court should be affirmed.
Mr. Justice WAYNE also dissented from the opinion of the court.
Mr. Justice WOODBURY, having given an official opinion as Secretary of the Treasury against the claim of the bank in this case, did not sit.

Order.
This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern District of Pennsylvania, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be and the same is hereby reversed, and that this cause be and the same is hereby remanded to the said Circuit Court, with directions to that court to award a venire facias de novo, and for further proceedings to be had therein in conformity to the opinion of this court.