Doe on the demise of Stauffer and Another *v.* Stephenson and Others.

The act of Congress, approved *February* 27, 1841, confirming the selection of public lands made by this state in 1839, for the purpose of extending the *Wabash and Erie Canal* to *Terre Haute*, did not embrace land previously pre-empted under the act of 1838; and proof of such pre-emption, and final payment, made in 1841, was a sufficient compliance with the pre-emption laws as revised and extended.

The word "cancelled" written over a land-office certificate of purchase, is not sufficient evidence of its cancellation.

By section 3, c. 79, Laws of 1833, and sections 1, 8, and 9, R. S. 1843, c. 29, land-office certificates of final payment, were made evidence of legal title.

APPEAL from the *St. Joseph* Circuit Court.

Stuart, J.—Ejectment for the recovery of a tract of land lying in *Kosciusko* county. The suit was instituted in *Kosciusko*, and taken by change of venue to *St. Joseph.* Trial by the Court on an agreed state of facts; finding and judgment for the defendants. The *Stauffers* appeal.

The facts agreed upon and the documentary evidence, made part of the record in proper form, are given in full.

"For the purpose of a trial at the present term, and for the purpose of dispensing with other proofs at such trial, the following facts are mutually admitted:

"1. That *Alexander Stephenson*, the ancestor of the defendants, entered upon and made an actual settlement and residence upon said tract of land, he being then the head of a family and a housekeeper and [continued to reside thereon] without any cessation or interval from *October*, 1835, until the day of his death, which occurred in the month of *October*, 1850; and the land was then, and remained, the property of the *United States*, until conveyed as in this agreement shown.

"2. That the state of *Indiana*, in 1839, selected this tract of land, amongst others, for the purpose of aiding her in the construction of the *Wabash and Erie Canal*, from the mouth of the *Tippecanoe* river to *Terre Haute*, and filed with the secretary of the treasury a list of the lands so by her selected, of which said tract was one; and

May Term, 1857.

DOE
v.
STEPHENSON.

that the list so filed is the same referred to in the first section of the act of Congress of *February* 27, 1841, confirming lands so selected to the state.

"3. That on *October* 9, 1841, the defendants' ancestor proved his settlement upon the land, and claimed a preemption thereon, conformably to the rules of the general land-office; exemplifications of which proofs are herewith submitted marked ' A.,' and all objection to the manner or want of authentication waived, and the facts therein mentioned admitted to be true; and on the day last mentioned, he paid for said land, and got his duplicate certificate of final payment from the proper officer of the *United States*, at the land-office at *Winnimac*. The production of the duplicate certificate is waived.

"4. That neither the said *Alexander Stephenson*, the ancestor, nor the said defendants, his heirs, ever received a patent for the land from the general government.

"5. That on the 15th of *November*, 1843, the lessors of the plaintiff bought said land from the state of *Indiana*, and afterwards, on the 10th of *April*, 1850, procured patents therefor from the state. The production of the patents is waived.

"6. That *Alexander Stephenson* died intestate on the first day of *October*, 1850, and that the defendants are his only heirs at law, &c.

"7. That the lessors of the plaintiff, for the space of a year or more before they purchased said land from the state of *Indiana*, knew of *Alexander Stephenson's* possession of and residence upon the land, and that he had had a settlement thereon for several years, and ever since *October*, 1835."

These are all the material facts agreed upon and signed by the parties in *April*, 1852.

The other evidence shows that *Stephenson*, with his wife and children, moved into a house he had built thereon, in *October*, 1836; that they have made that their only home ever since, residing there up to *March* 6, 1841; and that there were twelve acres cleared and in cultivation.

The lessors of the plaintiff, therefore, claim under a title

from the state of *Indiana;* the defendants under a pre-emption and purchase from the *United States.*

The act of Congress of *March* 2, 1827, entitled " An act to grant a certain quantity of land to the state of *Indiana,* for the purpose of aiding her in opening a canal between the *Wabash* river and lake *Erie,*" has nothing to do with the question at bar, further than as a historical link. The selections under that act were, by its terms, confined to the alternate sections five miles each side of the canal. The land in controversy in this case is far beyond these limits, and not affected by that act.

The same is true of another act on the same subject, approved *May* 29, 1830. It gives the state the power to select a certain quantity of land in lieu of the canal lands granted by the former act, but which had been previously disposed of by the *United States.* The selection, however, is limited to the reserved alternate sections five miles each side of the canal.

In 1839, the state proceeded to select certain other lands outside of the ten-mile strip bordering on the canal, for the purpose of continuing that work from the mouth of the *Tippecanoe* to *Terre Haute.* This selection, extending over the north part of the state, and embracing the quarter-section in controversy, was confirmed to the state by the act of Congress approved *February* 27, 1841. The confirmation runs,—"that there be and hereby is confirmed to the state of *Indiana,* the land selected by her under the provisions of the act of the 2d of *March,* 1827, entitled, &c., for that portion of the canal between the mouth of the *Tippecanoe* river and *Terre Haute.*"

It is contended in argument, that this is a legislative construction of the act of *March,* 1827, recognizing the canal as to be extended to *Terre Haute,* and the right of the state to select lands as she did. So far as the rights of the *United States* alone were involved, perhaps this construction might be admitted. But such a legislative construction cannot be admitted to the prejudice of parties who have acquired rights under other acts of Congress.

That the selection of lands by the state in 1839, was not

made under the act of *March* 2, 1827, is perfectly clear:

1. In that the rights of the state are expressly confined to the alternate sections five miles on each side the canal. 2. In that the canal has its western terminus at the mouth of the *Tippecanoe.* 3. In that the legislature of *Indiana* is expressly limited in the application of the proceeds to "the purposes aforesaid, and no other"—that is to say, to the making a canal from the mouth of the *Tippecanoe* to lake *Erie.* The lessors of the plaintiff must, therefore, rely solely on the act of *February,* 1841. The selection made by the state in 1839, receives no support from prior legislation, further than the *United States* herself may be affected. The selection of the state in 1839, appears to have been made without authority, and considerately adopted by the federal legislature.

The terms of the act of *February,* 1841, very clearly show that Congress did not thereby intend to compromit any rights but those of the *United States.* The second section of that act guardedly provides, "that should any of said lands, at the time of their selection and location by the state, have been subject to any right of pre-emption," &c., the state is thereby authorized to select other lands in lieu of those so encumbered. 5 U. S. Stat. 414. Thus, while Congress generously transferred the rights of the *United States* to the state, it was cautiously provided that the grant or confirmation should not interfere with the rights of pre-emptors.

It but remains, therefore, to glance at the pre-emption laws, and the rights of *Stephenson's* heirs under them.

The act of *May* 29, 1830, gave pre-emption rights to actual settlers, under various restrictions, who were then in possession, and had cultivated any part of the land during the previous year (1829). The act was limited to one year from its passage.

The act of *June* 22, 1838, granted pre-emption rights to "every actual settler of the public lands, being the head of a family, or over twenty-one years of age, who was in possession and a housekeeper, by personal residence thereon at the time of the passage of that act, and for four months

next preceding." For the benefit of such persons, the act of *May* 29, 1830, was revived and continued in force for two years.

The act of *June* 1, 1840, continued the act of *June* 22, 1838, in force for two years more—thus carrying the pre-emption acts into *June*, 1842. This is as far as it is necessary for the purposes of this case to pursue this branch of the inquiry.

What were the rights of *Stephenson* under these laws? It is admitted that he occupied the quarter-section in controversy from 1835 continuously up to his death in 1850. It is admitted that he filled every requirement of the several acts—being an actual settler, resident, householder, man of a family, for more than four months prior to the act of 1838. He was, therefore, entitled to pre-emption under that act as extended by the act of *June* 1, 1840. He continued so entitled from *June* 22, 1838, to *June* 22, 1842. He had such pre-emption right in 1839, when the state selected his land for canal purposes. His land was not, therefore, confirmed, by the act of *February*, 1841, to the state. It was embraced in the provisions of the second section of that act, as lands which, at the time of their selection and location by the state, were subject to the pre-emption right of *Stephenson*. In lieu of this land, the state might, under that section, have selected and reported other lands. But we apprehend it was not in the power of the state or the *United States*, to divest the title acquired by *Stephenson*. Nor was it, as we have seen, the intention of Congress to divest or disturb such a title as that of *Stephenson*. On the contrary, rights acquired under the pre-emption laws are expressly recognized and protected in the confirming act. Not only so, but the consequences to the state, of this protection to pre-emptors, are anticipated and repaired at the expense of the *United States*. The state is authorized to select other lands in lieu of such selections as have been thus pre-empted.

We are, therefore, of opinion that the act of *February*, 1841, confirming the selections of land made by this state in 1839, did not embrace or affect *Stephenson's* land; and

that his proof of pre-emption and payment in *October*, laws as revised and extended (1).

Something is said in argument about the certificate of purchase being cancelled by the commissioner of the general land-office. Among the papers in evidence is the exemplification of such a certificate with the word "cancelled" written over it. But it nowhere appears how, where, or by what authority, it was cancelled, if such were the fact. Something more than the mere word "cancelled" would be necessary to establish the fact. The fiat of a mere government official, would not ordinarily be accepted by the Courts as a sufficient reason for annulling a contract, even where the state of *Indiana* was to be benefited thereby, and the wrong thus done was to one of her humblest citizens. A mere subordinate executive officer cannot be permitted to place himself above the law. We know no way of annulling contracts but by consent of parties, or by judicial proceedings.

It is further to be considered in this instance, that the agreed statement of facts is silent on the subject of cancellation. Not only so, but the agreement expressly admits that on the 9th of *October*, 1841, the defendants' ancestor proved his pre-emption claim, paid for the land, and received his duplicate certificate of final payment from the proper officer of the *United States*, the production of which certificate is expressly waived. This seems to the Court conclusive of *Stephenson's* title, the evidence of which was his certificate of final payment.

It only remains to inquire what was the legal effect of that certificate under our laws? Was it evidence of a legal, or only of an equitable title in *Stephenson?*

It is urged in argument, that the certificate conveys no legal title; that the legal title was passed by the *United States* to the state, and by the latter to the lessors of the plaintiff. On these assumed facts, it is well urged that the legal title must prevail. Till. Adams on Eject. 32.— *Rench* v. *Doe*, 2 Blackf. 309.—*Spencer's Lessee* v. *Marckel*, 2 Ohio R. 263.—*Jackson* v. *Harrington*, 9 Cow. 86.

May Term,
1857.

But the legislature of this state has made land-office certificates of final payment, evidence of legal title. Laws of 1833, p. 112.—R. S. 1843, c. 29, ss. 1, 8, 9. These enactments were carefully examined in *Dickerson* v. *Nelson*, 4 Ind. R. 160, and the attention of the Court was again called to them by petition for a rehearing. *Dickerson* v. *Nelson, id.* 280. It was there held that certificates of purchase or of final payment were evidence of legal title.

*Stephenson's* title was, therefore, a legal title; and connecting it with the pre-emption laws and his occupancy under them, it was both prior and superior to the title of the lessors of the plaintiff, derived from the confirmatory act of Congress of 1841. Nor can the lessors of the plaintiff claim as innocent purchasers. It is admitted that they were aware of the occupancy and rights of *Stephenson* at the time they purchased.

*Per Curiam.*—The judgment is affirmed with costs.

*T. G. Harris, H. C. Newcomb,* and *J. S. Harvey,* for the appellant.

*J. S. Frazer,* for the appellees.

(1) No reservation or appropriation of a tract of land can be made, after a citizen has acquired a right to it under a pre-emption law. *United States* v. *Fitzgerald,* 15 Pet. 401.—14 Curtis's R. 128. It was decided in *Lytle* v. *Arkansas* (9 How. 314—18 Curtis's R. 154), that the act of *June* 15, 1832 (4 U. S. Stat. at Large, 531), granting land to the territory of *Arkansas,* did not affect a pre-emption right then duly proved.