Mr. Justice Miller
delivered tbe opinion of tbe Court:
Tbe above-named eases are all appeals from -tbe Court of Claims. Tbe first is before us in a separate record. Tbe other three, although distinct claims with separate pleadings, are certified to us as one record with one finding of facts for them all.' They are alike in every respect, except the names of tbe plaintiffs and tbe amounts claimed. Tbe case of Pierce differs from tbe others in some respects; but we shall endeavor to present tbe considerations which must determine tbe judgment of the court in all the cases in one opinion.
They are demands against tbe United States founded upon instruments claimed to be bills of exchange, drawn by Russell, Majors & Waddell on John B. Floyd, Secretary of War, and accepted by him in that capacity, purchased by plaintiff's before maturity for a valuable consideration, and, as they allege, without notice of any defence to them. The following *67 copy of one of these bills will answer for all, as there is no difference in their verbal structure which is material to the corfsideration of the matter in issue :
u $6,000. Washing-ton, November 28,1859.
“ Ten months after date, for value received, pay to our own order, at the Bank of the Republic, New York City, five thous- and dollars, and charge to account of our contract for supplies for the army in Utah.
‘•'RUSSELL, MAJORS & WADDELL.
“Hon. John B. Floyd,
<£ Secretary of W«r.”
Indorsement: “Russell, Majors & Waddell. E. L. Acceptance: War Department, November 28,1859. Accepted. John B. Floyd, Secretary of War.”
Mr. Pierce in his petition relies on the facts that the signature of John B. Floyd to these acceptances is genuine, and that he was at the time of the acceptance Secretary of War, as sufficient to establish his claim. He avers that Floyd, as Secretary of War, had authority to accept the drafts, and that by his-acceptance the United States became bound. Itis evident that he means by this merely to assert, a-s a principle of law, that by virtue of his office the Secretary had such authority, and not that there existed in this case special facts which gave such authority ; for lie mentions no such factsin his petition, and when the solicitors for the defendant undertook to show under what circumstances the bills were issued and accepted, he objected to the evidence. Its admission is one of the alleged errors on which he brings the case to this court.
Both Mr. Pierce and his counsel, therefore, claim to recover on the doctrine that when a party produces an instrument in the form of a bill of exchange, which he has purchased before its maturity, drawn on the Secretary of War and accepted by him, he has established a claim against the Government which admits of no inquiry into the circumstances under which the acceptance was made.
The other defendants also, in their original petitions, assert • and rely upon the same principle; but they have also filed amended petitions, in which they set forth facts connected with the acceptance of the Secretary which they deem suffi *68 cient to establish his right or authority to do so. Most of the facts found under the issues made by these amended petitions were also found under the general issue in Pierce’s case, notwithstanding his objection; so that if they avail the other plaintiffs, they will also support his claim.
It will be convenient, therefore, to consider first the proposition on which he rests his case, which, if found to be sound, disposes of all the cases in favor of plaintiffs.
One of the main elements of that proposition, much and eloquently urged upon our attention, seems to be too well established by the decisions of this court to admit now of serious controversy. It must be taken as settled, that when the United States becomes a party to what is called commercial j)aper — by which is meant that class of paper which is transferable by indorsement or delivery, and, between private parties, is exempt in the hands of innocent holders from inquiry into the circumstances .under which it was put in circulation — they are bound in any court, to whose jurisdiction they submit, by the same principles that govern individuals in their relations to such paper.
Conceding-, then, for the sake of argument, that the instrument of which we have given a copy is in form a bill of that character, and that the signature of Floyd is genuine, and that he was at the time Secretary of War, there remains but one question to be considered essential to plaintiffs’ right to recover, and that concerns the authority of the Secretary to accept the bill on behalf of the Government.
It is not to be denied, that in the extensive and varied fiscal operations of the Government, bills of exchange are found to be valuable instruments, of which it has the right to avail itself whenever they may be necessary. In the transfer of immense .sums of money from one part of the country to another, and ■in the payment of dues at distant points where they should .properly be paid, it uses, as it ought to use, this time-honored mode of effecting these purposes.
In the case of such paper issued by an individual, when we make ourselves sure of his signature we are sure that he is bound, because the right to make such paper belongs to all men. But the Government is an abstract entity, which has no hand to write or mouth to speak, and has no signature which can be recognized, as in the case of an individual. ' It speaks *69 and acts only through agents, or more properly, officers. These are many, and have various and diverse powers confided to them.
An individual may, instead of signing with his own hand ■ the notes and bills which he issues or accepts, appoint an agent to do these things for him. And this appointment may be a general power to draw or accept in all cases as fully as the principal could; or, it may be a limited authority to draw or accept under given circumstances, defined in the instrument which confers the power. But in each case the person dealing with the agent, knowing that he acts only by virtue of a delegated power, must at his peril see that the paper on which he relies comes within the power under which the agent acts. And this applies to every person who takes the paper afterward; for it is to be kept in mind that the protection which commercial usage throws around negotiable paper cannot be used to establish the authority by which it was originally issued. These principles are well established in regard to the transactions of individuals. They are equally applicable to those of the Government. Whenever negotiable paper is found in the market purporting to bind the Government, it must necessarily be by the signature of an officer of the Government, and the purchaser of such paper, whether the first holder or another, must at his peril see that the officer had authority to bind the Government.
When this inquiry arises, where are we to look for the authority of the officer ?
The answer which at once suggests itself to one familiar with the structure of our Government, in which all power is delegated and is defined by law, constitutional or statutory, is, that to one or both of these sources we must resort in every instance. We have no officers in this Government, from the President down to the most subordinate agent, who does not hold office under the law with prescribed duties and limited authority. And while some of these, as the President, the legislature, and the judiciary exercise powers in some sense left to the more general definitions necessarily incident to fundamental law found in the Constitution, the larger portion of them are the creation of statutory law, with duties and.powers prescribed and limited by that law. It would seem reasonable, then, that on the question of the authority of the Secretary of *70 War to accept bills of exchange, we must look mainly to' the acts of Congress.
The counsel for claimants, not altogether rejecting this view of the matter, maintain that the power is derived—
. 1st. From the true construction of the Constitution and acts of Congress.
2d. From the decisions of the Supreme Court of the United States; by which is probably meant only the authoritative construction of the Constitution and laws.
3d. From the usage of the Government in similar cases.
We will examine these several alleged sources of the power in the reverse order as here stated.
1. As regards usage, it must occur at once that if there are instances in which the use of bills of exchange by the officers of Government is authorized by law, as undoubtedly there are, the use of them in such cases, however common, cannot establish a usage in cases not so authorized.
It may also be questioned whether the frequent exercise of a power unauthorized by law, by officers of the Government, can ever by its frequency be made to stand as a just foundation for the very authority which is thus assumed.
It is to be observed in this connection, that the Court of Claims finds as a fact, in Pierce:s case, that “ the evidence fails to establish any usage or practice in the different departments of the Government, by virtue of which the Secretary of War was authorized to accept, in behalf of the United States, the bills in suitand so far as that case is concerned this inquiry might close there.
But in the finding of facts which the same court makes in the other three cases, it is said, “ That it is and has been the practice of the heads of departments to accept drafts or bills of exchange for the transmission of funds to disbursing officers, or the payment of those serving in distant stations, or for services rendered.” The usage here found is limited to specified classes of cases, and if authorized by law, can be no evidence of a usage in cases not so authorized. It cannot be held to support the allegation of a usage so general as to apply to any case in which the head of the department may see proper to use it.
We make the further observation in this connection, that while it is readily tobe seen that the exigencies of the business *71 of the departments may require drafts to-be drawn by them, and may justify drafts being drawn on them, which they ought to and do pay when presented, there can be no occasion for an acceptance by any department or officer of a draft drawn on either of them. .
We do not think, therefore, that usage is a sufficient reliance as an authority for the acceptance of these drafts.
2. The United States v. The Bank of Metropolis, (15 Peters, 377,) is the case mainly relied on as establishing the doctrince contended for by plaintiffs, and is confidently asserted to be conclusive of the cases under consideration, unless overruled.
That case undoubtedly did decide that when an officer of the Government authorized to do so accepted a draft in behalf of the United States or-one of the departments, the validity of the instrument could not be disputed in the hands of an innocent holder. We have already stated this as the established doctrine of this court. And that proposition was the principal, if not the only one, controverted in that case. An attentive examination of it will show that the authority of the officers to accept was not raised by counsel or considered by the court.
The Bank of the Metropolis being sued for certain balances in favor of the United States, pleaded as a set-off a draft drawn by Edwin Porter on Richard O. Mason, treasurer of the Post-Office Department, at ninety days, and accepted by him as treasurer; and also four drafts at ninety days, drawn by James Reeside on Amos Kendall, Postmaster General, and “ accepted on condition that his contracts be complied with.”
It does not appear to have been controverted that Mason had authority to accept the draft of Porter, by either the counsel for the Government or the bank; and the court seem to have treated it as conceded.
The opinion of the court, after stating the facts, opens with the declaration that, u When the United States, by its authorized officer, becomes a party to negotiable paper, they have all the rights, and incur all the responsibilities of individuals who are parties to such instruments.” And further on it is said, tha,t “ an unconditional acceptance was tendered to it (the bank) for discount * * all it had to look to was the genuineness of the acceptance, and the authority of the officer to give it.” If this language has any significance, it is that the authority of the officer, like the genuineness of the signature, is always *72 to be inquired into at tbe peril of tbe party taking an acceptance purporting to bind tbe Government.
Only a small part of that elaborate opinion is devoted to Porter’s draft and to tbe questions involved in it, and tbe remainder of it is occupied in discussing tbe effect of tbe condition annexed to tbe acceptance of Eeeside’s draft on its commercial character, and to determining wbat is implied in that condition.
It seems, therefore, quite clear that no consideration whatever was given by tbe court to wbat constituted an authority to draw or accept bills of exchange; but that it was impliedly held to be a matter always open to inquiry when the draft was attempted to be enforced against tbe Government. Nor are we aware of any case in this court in -which tbe rule for determining that authority has been laid down.
Recurring, then, to tbe written law as tbe exclusive source of such authority, we may confidently assert that there is no express authority to any officer of tbe Government to draw or accept bills of exchange.
Our statute boobs are filled with acts authorizing the making of contracts with the Government through its various officers and departments, but, in every instance, the person entering into such a contract must look to the statute under which it is made, and see for himself that his contract comes within the terms of the law.
Does the contract, called a bill of exchange, stand on any different footing ? It is true, that when once made, by a person having authority to make it, in any given casé, it is not open to the same inquiries, in the hands of a third party, that ordinary contracts are as to the justice, fairness, and good faith which attended its origin, or any of its subsequent transfers; but, in reference to the authority of the officer who makes it to bind the Government, it is to be judged by the same rule as other contracts.
The authority to issue bills of exchange not being one expressly given by statute, can only arise as an incident to the exercise of some other power. When it becomes the duty of an officer to pay money at a distant point, he may do so by a bill of exchange, because that is the usual and appropriate mode of doing it. So, when an officer or agent of the Government at a distance, s entitled to money here, the person hold *73 ing tbe fund may pay his drafts. And whenever, in conducting any of the fiscal affairs of the Government, the drawing a bill of exchange is the appropriate means of doing that which the department, or officer having the matter in charge, has a right to do, then he can draw and bind the Government in doing so. But the obligation resting on him to perform that duty, and his right and authority to effect such an object, is always open to inquiry, and if they be found wanting, or if they be forbidden by express statute, then the draft or acceptance is not binding on the Government.
It cannot be maintained that because an officer can lawfully issue bills of exchange for some purposes, that no inquiry can be made in any case into the purpose for which a bill was issued. The Government cannot be held to a more rigid rule, in this respect, than a private individual.
If A authorizes B to buy horses for him, and to draw on him for the purchase-money, B cannot buy land and bind A, by drawing on him for the price. Such a doctrine would enable a man, in private life, to whom a well-defined and limited authority was given, to ruin the principal who had conferred it. So.it would place the Government at the mercy of all its agents and officers, although the laws under which they act are public statutes. This doctrine would enable the head of a department to flood the country with bills of exchange, acceptances, and other forms of negotiable paper, without authority and without limit. No government could protect itself, under such a doctrine, by any statutory restriction of authority short of an absolute prohibition of the use of all commercial paper.
In accordance with these views, we are of opinion that, as there can be no lawful occasion for any department of the Government, or for any of its officers, or agents, to accept drafts drawn on them, under any statute or other law now known to us, such acceptances cannot bind the Government.
An examination .of the facts found by the Court of Claims confirms the views already stated.
It appears that Russell, Waddell & Majors, the drawers of the bills, had contracts for supplies and transportation, to be furnished to the army in Utah, during the period that these acceptances were given. That by these contracts they were to be paid, either by the quartermaster at Saint Louis or by his drafts on the assistant treasurer of the United States in New *74 York. In all the contracts, except one, these payments were to be made on the final delivery of the supplies in Utah; but in one contract there was an agreement that partial payments should be made when the trains were started. In all cases such payments were to be made upon certificates of the proper quartermaster.
The performance of these contracts required a very large outlay of money, and Russell & Co. finding it difficult to advance this and wait for its return until they were entitled to receive payment under their contracts, made an arrangement with the Secretary of War, under which these acceptances were given. That arrangement was that they should draw time-drafts on him, payable to their own order, at the Bank of the Republic in New York, which should be accepted by the Secretary. That on these drafts they should raise the money necessary to enable them to perform their contracts, and as the money for the transportation and supplies became due, they should receive it, and take up the acceptances of the Secretary before or at maturity. Under this arrangement the Secretary accepted drafts to the amount of five millions of dollars, most of which were taken up by Russell, Majors & Waddell as agreed; but over a million of dollars in amount remain unpaid.
Counsel for plaintiffs seem to have been of the opinion from the start that there was nothing in the nature of the transaction which would support the paper on which they sued, for they steadily resisted all efforts on the part of Government to give the facts in evidence; and in the arguments made in this court, the right to recover is rested almost exclusively on the proposition that because in some cases the Secretary might lawfully accept, it must be presumed in their favor that these drafts were lawfully accepted.
It seems to us that such a transaction can be defended on no principle of law, and that in thus lending to Russell & Co. the name and credit of the United States, the Secretary was acting wholly beyond the scope of his authority. The paper was, in fact, accommodation paper, as it was found to be by the Court of Claims, by which the Secretary undertook to make the United States acceptor for the sole benefit of the drawers. It was a loan of the credit of the Government, volunteered by him without consideration and without authority. *75 That the transaction was not .payment, nor intended to be payment, for the supplies furnished, is clear, because the acceptances were not expected to be paid by the Government, nor payable at the Treasury, but were to be met by the drawers at the bank with which they dealt. These drafts did not interrupt in the least the regular payments made to Russell & Oo. by the Quartermaster’s Department, according- to their contracts. Nor do the drafts seem to have had any relation to anything- due on these contracts, or to what might become due before their maturity. It was, therefore, not payment, nor so considered by either party.
But if these acceptances can be considered as payments, they were payments in advance of the service rendered and supplies furnished — payments made before anything was due. They, are in that view not only without authority of law, but are expressly forbidden by the act of January 31, 1823. (3 Stat. L., p. 723.) The first section of that statute, which has never been repealed, enacts “ That from and after the passing of this act no advance of public money shall be made in any case whatever; but in all cases of contracts for the performance of any service, or the delivery of articles of any description for the use of the United States, payment shall not exceed the value of the services rendered or the articles delivered previous to such payment.” The transaction by which these drafts were accepted was in direct violation of this law,'and of the limitations which it imposes upon all officers of the Government.
Every citizen of the United States is supposed to know the law, and when a purchaser of one of these drafts began to make the inquiries necessary to ascertain the authority for their acceptance, he must have learned at once that if received by Russell, Majors & Waddell as payment, they were in violation of law, and if received as accommodation paper they were evasions of this law, and without any shadow of authority.
It is proper to observe that it does not appear from this record that anything remains due to Russell & Go. undgr their contract with the Government, or that anything was due them at the maturity of any of these drafts, nor is there any attempt on the part of plaintiffs to show either of these things, or the state of the accounts between those contractors and the Government at the time the drafts matured.
These cases have long been before the Departments, before *76 Congress, and tbe Court of Claims, and have been tbe subject of much laborious consideration everywhere. Tbe amount involved is large, tbe principles on wbicb tbe claims are asserted are to some extent new, and we have given them a careful and earnest investigation. We are of opinion that tbe judgments rendered by tbe Court of Claims against tbe plaintiffs must be
Affirmed.